# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# WICHITA FALLS DIVISION

| | |
|---|---|
| **MARY OGUNTODU, individually, and on behalf of the estate of JOSEPH OGUNTODU,** § § § § | |
| *Plaintiff*, § § | |
| v. § | CIVIL ACTION NO. 7:21-cv-11 |
| § § | |
| **KARA PAINTER, and CHETEIGRA PETERSON,** § § § | |
| *Defendants*. § | |

## ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, MARY OGUNTODU, individually, and on behalf of the estate of JOSEPH OGUNTODU, Plaintiff, complaining of KARA PAINTER and CHETEIGRA PETERSON, and for causes of action will respectfully show unto the Court as follows:

## I.
## PARTIES

1. Plaintiff Mary Oguntodu is an individual who resides in Dallas County, Texas.

2. Defendant Kara Painter is an individual residing in Wichita County, Texas, and may be served at her residence in Wichita Falls, Texas, or wherever she may be found. Defendant Painter is being sued in her individual capacity.

3. Defendant Cheteigra Peterson is an individual residing in Lawton, Oklahoma, and may be served at her residence in Lawton, Oklahoma, or wherever she may be found. Defendant Peterson is being sued in her individual capacity.

1

## II.
## JURISDICTION AND VENUE

4. The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.

5. Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391 because all of the causes of action accrued in the Northern District of Texas.

## III.
## FACTS AND ALLEGATIONS

6. "It is well established that prison officials have a constitutional duty to protect prisoners from violence at the hands of their fellow inmates." *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009); quoting, *Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir.2006).

7. People who are incarcerated at the James V. Allred Unit are dependent upon the Texas Department of Criminal Justice and its employees to provide them with protection from violence at the hands of their fellow inmates.

8. At all times during his confinement in James V. Allred Unit that make the basis of this lawsuit, Joseph Oguntodu (hereinafter referred to as "Mr. Oguntodu") was classified as a convicted inmate who was afforded protection under the Eighth Amendment to the United States Constitution.

9. In March of 2019, Mr. Oguntodu was an inmate in the James V. Allred Unit.

10. J.W.[1] was an inmate housed three or four cells down from Mr. Oguntodu.

11. Because of the close distance between their cells, J.W. could hear conversations taking place at Mr. Oguntodu's cell.

---

[1] A pseudonym is being used to protect J.W.'s identity, as he is an inmate who may be at an increased risk of harm due to the prevalence of inmate-on-inmate assaults like the one at issue in this case.

2

12. Mr. Oguntodu did not hide that he was homosexual.

13. J.W. heard that Mr. Oguntodu's cellmate, C.G.[2], was getting pressure from other inmates about why he was allowing an openly homosexual inmate to reside in his cell with him.

14. As a result, C.G. threatened Mr. Oguntodu that he needed to move cells.

15. Mr. Oguntodu told multiple guards on March 6, 2019 that he needed out of the cell because of the threat from C.G.

16. A male guard stated loud enough for other inmates to hear, "that faggot ass hoe in 222 trying to catch out again"

17. Mr. Oguntodu was housed in cell 222.

18. The phrase "catch out" means to be moved cells.

19. This guard was stating loudly enough for other inmates to hear that the inmate in cell 222, who he referred to by a derogatory word for homosexual, was attempting to move cells.

20. The fact that this guard said that Mr. Oguntodu was trying to catch out "again" meant that Mr. Oguntodu had tried previously to warn the guards he was in danger and needed out of his cell; however, his requests were denied.

21. During the morning cell count on March 7, 2019, Mr. Oguntodu told Defendant Correctional Officer Kara Painter that he was having problems with his cellmate and he was in danger.

22. J.W. heard Mr. Oguntodu ask Defendant Painter to get him out of his cell because his cellmate was trying to do something to him and he wasn't going to survive.

---

[2] A pseudonym is being used to protect C.G.'s identity, as he is an inmate who may be at an increased risk of harm due to the prevalence of inmate-on-inmate assaults like the one at issue in this case.

23. Mr. Oguntodu made it clear to Defendant Painter that his life was in danger if he was not moved cells.

24. At the time when Mr. Oguntodu told Defendant Painter he was in danger if he was not moved, his cell window had already been covered so that the guards could not see into the cell.

25. Defendant Painter responded that Mr. Oguntodu "needed to be a man" and him and his cellmate "needed to take care of it."

26. J.W. heard Mr. Oguntodu's cellmate, C.G., tell Defendant Painter to go away because he was about to kill his "celly," referring to Mr. Oguntodu.

27. Defendant Painter responded, "make sure you have it done when I get back."

28. Defendant Painter did not make Mr. Oguntodu or C.G. uncover the window and did not open the door to view into the cell.

29. Mr. Oguntodu's cell door did not open during that cell count.

30. It was common practice for windows to be covered when inmate on inmate assaults were going to occur.

31. Defendant Painter was aware of this common practice by virtue of her knowledge and experience as a Correctional Officer V[3] in the James V. Allred unit.

32. Defendant Painter was hired on November 18, 2010; thus, on the day that she failed to protect Mr. Oguntodu, she had been employed with the Texas Department of Corrections for over eight years and understood these common inmate practices.

---

[3] https://www.tdcj.texas.gov/divisions/hr/pd/033203.pdf (To be eligible for the title of Correctional Officer V, an applicant must have had at least 72 consecutive months of active TDCJ service as a Correctional Officer.).

33. Defendant Correctional Officer Cheteigra Peterson came onto her shift on March 7, 2019 to relieve Defendant Painter from her shift.

34. The next cell count should have occurred at 12:30 PM or 1:00 PM.

35. Defendant Peterson did not conduct this early afternoon cell count as she was required.

36. Instead, Defendant Peterson remained at the guard desk throughout her shift without monitoring or observing the inmates.

37. Upon information and belief, Defendant Painter informed Defendant Peterson when she came on to relieve Defendant Painter's shift, that C.G. had threatened Mr. Oguntodu, and Defendant Peterson did not want the responsibility of intervening to protect Mr. Oguntodu, so she chose not to do her cell checks that day.

38. At no time did Defendant Peterson attempt to monitor or observe Mr. Oguntodu.

39. Upon information and belief, the reason that Defendant Peterson did not attempt to monitor or observe Mr. Oguntodu was because Defendant Painter informed Defendant Peterson when she came on to relieve Defendant Painter's shift, that C.G. had threatened Mr. Oguntodu, and Defendant Peterson did not want the responsibility of intervening to protect Mr. Oguntodu.

40. Defendant Peterson was aware that Mr. Oguntodu's window was covered as it could clearly be seen from where the guards worked in the pod.

41. Defendant Peterson was aware that it was common practice for windows to be covered when inmate on inmate assaults were going to occur, by virtue of her knowledge and experience as a Correctional Officer III in the James V. Allred unit.

42. Together with the information that Defendant Painter shared with Defendant Peterson regarding Mr. Oguntodu being threatened by his cellmate and asking to move cells and the fact that his window was covered, Defendant Peterson was aware of enough facts to know that Mr. Oguntodu was in danger of being assaulted by his cellmate.

43. The next count was going to be 6:30 PM.

44. Mr. Oguntodu was killed by his cellmate at some point during the day following Defendant Painter's early morning interaction with Mr. Oguntodu and C.G.

45. C.G. told Officer Schmidt that Mr. Oguntodu was dead.

46. However, Officer Schmidt did not believe him at first and walked away.

47. C.G. then told Officer Schmidt to come back to his cell because he needed him to remove Mr. Oguntodu's body.

48. Officer Schmidt realized that Mr. Oguntodu was dead and called over the radio for other officers to come to the cell.

49. Officers arrived, pulled C.G. out of the cell, and handcuffed him.

50. Officers brought a stretcher and removed Mr. Oguntodu from the cell.

51. The cell window had been covered all day from around 6:30 AM when Mr. Oguntodu asked Defendant Painter to remove him from his cell before C.G. killed him, until when they found Mr. Oguntodu's body that evening.

52. Following an investigation into Mr. Oguntodu's death, Defendants Painter and Peterson were disciplined and their employment was terminated.

53. The Defendants were at all times acting under the color of law.

# IV.
# CAUSES OF ACTION

### COUNT I

**FAILURE TO PROTECT**
**Violation of the Eighth Amendment Pursuant to 42 U.S.C. § 1983**
**Defendants Painter and Peterson**

54. A prison official's "deliberate indifference" to a substantial risk of serious harm to an inmate violates the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S. Ct. 1970, 1974, 128 L. Ed. 2d 811 (1994).

55. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003); quoting *Cantu v. Jones*, 293 F.3d 839, 844 (5th Cir.2002); citing *Farmer*, 511 U.S. at 832.

56. In particular, the Eighth Amendment imposes on prison officials a duty to protect prisoners from violence at the hands of other inmates. *Id.*

57. Prison officials can be held liable for their failure to protect an inmate only when they are deliberately indifferent to a substantial risk of serious harm. See *id.*

58. A prison official is deliberately indifferent if he knows of an "excessive risk to inmate health or safety" and disregards that risk. *Adames*, 331 F.3d at 512; citing *Farmer* 511 U.S. at 837.

59. A prison official "knows of" an excessive risk only if (1) he is aware of facts from which he could infer "that a substantial risk of serious harm exists" and (2) he in fact "draw[s] the inference." *Id.*

60. In order to be deliberately indifferent, a prison official must be subjectively aware of the risk. *Id.*; *See Farmer*, 511 U.S. at 839-40.

61. A prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 847.

62. In order to prove that an official is subjectively aware of a risk to inmate health or safety, a plaintiff inmate need not produce direct evidence of the official's knowledge. *Adame*, 331 F.3d at 512.

63. A plaintiff can rely on circumstantial evidence indicating that the official must have known about the risk. *Id.*; *See Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 2514, 153 L.Ed.2d 666 (2002) ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."); *Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence[.]").

64. The plaintiff can produce circumstantial evidence that the risk to inmate health or safety was so longstanding and pervasive that the official must have been aware of this danger. *Adame*, 331 F.3d at 512; *See Farmer*, 511 U.S. at 842–43.

65. A prison official may not escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault. *Farmer*, 511 U.S. at 843.

## Defendant Painter

**Defendant Painter knew of and disregarded an excessive risk to Mr. Oguntodu's health or safety.**

66. On March 7, 2019, Defendant Painter was aware that Mr. Oguntodu's life was in danger from being assaulted by his cellmate; however, instead of intervening and protecting Mr. Oguntodu, Defendant Painter encouraged the assault to occur and did nothing to prevent it from happening.

> **i. Defendant Painter was both aware of facts from which she could infer that a substantial risk of serious harm existed and actually made that inference.**

67. During the morning cell count on March 7, 2019, Mr. Oguntodu told Defendant Painter that he was having problems with his cellmate and he was in danger.

68. J.W. heard Mr. Oguntodu ask Defendant Painter to get him out of his cell because his "celly" was trying to do something to him and he wasn't going to be able to survive.

69. Mr. Oguntodu made it clear to Defendant Painter that his life was in danger if he was not moved cells.

70. When Mr. Oguntodu told Defendant Painter he was in danger if he was not moved, his cell window was covered so that the guards could not see into the cell.

71. Defendant Painter responded that Mr. Oguntodu "needed to be a man" and him and his cellmate "needed to take care of it."

72. J.W. heard Mr. Oguntodu's cellmate, C.G., tell Defendant Painter to go away because he was about to kill his "celly," referring to Mr. Oguntodu.

73. Defendant Painter responded, "make sure you have it done when I get back."

74. Defendant Painter did not make Mr. Oguntodu or C.G. uncover the window and did not open the door to view into the cell.

75. Mr. Oguntodu's cell door did not open during that cell count.

76. It was common practice for windows to be covered when inmate on inmate assaults were going to occur.

77. Defendant Painter was aware of this common practice by virtue of her knowledge and experience as a Correctional Officer V in the James V. Allred unit.

78. To be eligible for the title of Correctional Officer V, Defendant Painter must have had at least 72 consecutive months of active TDCJ service as a Correctional Officer.[4]

79. Thus, Defendant Painter was aware of facts from which she could infer that a substantial risk of serious harm existed when Mr. Oguntodu specifically told her that he was not going to survive in his cell because of his cellmate if he was not moved, all while the window to his cell was covered, which was a common practice during inmate-on-inmate assaults, which Defendant Painter was aware of due to her experience as a correctional officer for over eight years at the Texas Department of Corrections.

80. Defendant Painter actually made that inference because she responded that Mr. Oguntodu "needed to be a man" and he and his cellmate "needed to take care of it," and responded, "make sure you have it done when I get back" when C.G. told her to leave so he could kill Mr. Oguntodu.

### ii. Defendant Painter failed to take reasonable measures to abate the risk.

81. Defendant Painter failed to take reasonable measures to abate the risk by failing to open the door to check on Mr. Oguntodu's wellbeing, failing to require the

---

[4] https://www.tdcj.texas.gov/divisions/hr/pd/033203.pdf

window of the cell to be uncovered, failing to move Mr. Oguntodu, and failing to adequately respond to Mr. Oguntodu's clear and specific requests for help and C.G.'s statement to leave so he could kill Mr. Oguntodu.

82. Defendant Painter could have taken reasonable measures to abate the risk by moving Mr. Oguntodu, opening the cell to check on Mr. Oguntodu's wellbeing, requiring the window to be uncovered, or adequately responding to Mr. Oguntodu's clear and specific requests for help and C.G.'s statement to leave so he could kill Mr. Oguntodu.

83. Defendant Painter's deliberate indifference to Mr. Oguntodu's safety by failing to protect Mr. Oguntodu following his clear and specific requests for help and C.G.'s statement to leave so he could kill Mr. Oguntodu, was the direct and proximate cause of Mr. Oguntodu's injuries and death, as the assault would not have occurred if Defendant Painter would have taken action to separate Mr. Oguntodu from C.G..

84. As a direct, proximate, and foreseeable result of Defendant Painter's actions, Mr. Oguntodu suffered serious physical injuries, pain and suffering, and death.

### Defendant Peterson

**Defendant Peterson knew of and disregarded an excessive risk to Mr. Oguntodu's health or safety.**

85. On March 7, 2019, Defendant Peterson was aware that Mr. Oguntodu's life was in danger from being assaulted by his cellmate; however, instead of intervening and protecting Mr. Oguntodu, Defendant Peterson did nothing to prevent the assault from happening.

> **i. Defendant Peterson was both aware of facts from which she could infer that a substantial risk of serious harm existed and actually made that inference.**

90. Defendant Peterson came onto her shift on March 7, 2019 to relieve Defendant Painter from her shift.

91. The next cell count should have occurred at 12:30 PM or 1:00 PM.

92. Defendant Peterson did not conduct this early afternoon cell count as she was supposed to do.

93. Instead, Defendant Peterson remained at the guard desk throughout her shift without monitoring or observing the inmates.

94. Upon information and belief, Defendant Painter informed Defendant Peterson when she came on to relieve Defendant Painter's shift, that C.G. had threatened Mr. Oguntodu, and Defendant Peterson did not want the responsibility of intervening to protect Mr. Oguntodu, so she chose not to do her cell checks that day.

95. At no time did Defendant Peterson attempt to monitor or observe Mr. Oguntodu.

96. Upon information and belief, the reason that Defendant Peterson did not attempt to monitor or observe Mr. Oguntodu was because Defendant Painter informed Defendant Peterson when she came on to relieve Defendant Painter's shift, that C.G. had threatened Mr. Oguntodu, and Defendant Peterson did not want the responsibility of intervening to protect Mr. Oguntodu.

97. Defendant Peterson was aware that Mr. Oguntodu's window was covered as it could clearly be seen from where the guards worked in the pod.

98. Defendant Peterson was aware that it was common practice for windows to be covered when inmate on inmate assaults were going to occur, by virtue of her knowledge and experience as a Correctional Officer III in the James V. Allred unit.

### ii. **Defendant Peterson failed to take reasonable measures to abate the risk.**

86. Defendant Painter failed to take reasonable measures to abate the risk by failing to perform mandatory cell checks in order to monitor and observe inmates, including Mr. Oguntodu, which allowed C.G. to assault and kill Mr. Oguntodu.

87. Defendant Peterson could have taken reasonable measures to abate the risk by performing the state required mandatory cell checks in order to monitor Mr. Oguntodu or move him from his cell before C.G. killed him.

88. Defendant Painter's deliberate indifference to Mr. Oguntodu's safety by failing to protect Mr. Oguntodu by failing to monitor and check on Mr. Oguntodu, was the direct and proximate cause of Mr. Oguntodu's injuries and death, as the assault would not have occurred if Defendant Peterson would have taken action to monitor Mr. Oguntodu or separate Mr. Oguntodu from C.G.

89. As a direct, proximate, and foreseeable result of Defendant Peterson's deliberate indifference, Mr. Oguntodu suffered serious physical injuries, pain and suffering, and death.

### Count Two

### Survival Action
### Against All Defendants

90. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

91. Plaintiff Mary Oguntodu brings his claim on behalf of the estate of Joseph Oguntodu.

92. Mr. Oguntodu died as a result of the Defendants' wrongful conduct.

93. Mr. Oguntodu would have been entitled to bring this action against the Defendants if he had lived.

94. The Decedent's right of action for wrongful conduct against the Defendants survives in favor of the estate of the deceased.

95. Defendants are liable to the Estate of the deceased for the loss of Mr. Oguntodu's life, pain and suffering, and the violation of his civil rights.

96. Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## Count Three

## Wrongful Death
## Against All Defendants

97. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

98. Plaintiff Mary Oguntnodu is Joseph Oguntodu's mother.

99. By reason of Defendants' wrongful conduct of being deliberately indifferent to Mr. Oguntodu's health and safety by failing to protect him from a known risk, Defendants are liable for damages.

100. To recover on a wrongful death claim under 42 U.S.C. § 1983, a plaintiff who has standing must show both (1) the alleged constitutional deprivation required by 42 U.S.C. § 1983 and (2) the causal link between the defendant's unconstitutional acts or omissions and the death of the victim.

101. The Defendants deliberate indifference to Mr. Oguntodu's health and safety by failing to protect him from a known risk violated Mr. Oguntodu's constitutional right under the Eighth Amendment and caused his death.

102. Defendants' conduct that caused Mr. Oguntodu's death was a producing cause of injury, which resulted in the following damages: loss of a family relationship, love, support, services, emotional pain and suffering, and for their acts and infliction of emotional distress caused by the wrongful death of Mr. Oguntodu.

103. Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## V.
## PUNITIVE DAMAGES

104. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

105. When viewed objectively from the standpoint of Defendants Painter and Peterson, at the time of the occurrence, Defendants Painter and Peterson's conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

106. As a direct, proximate, and producing cause of Defendants Painter and Peterson's reckless or callous indifference to Mr. Oguntodu's constitutionally protected rights, Plaintiff is entitled to recover punitive damages against Defendants Painter and Peterson in an amount within the jurisdictional limits of this Court.

## VI.
## DAMAGES

107. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

108. Mr. Oguntodu's injuries and death were a foreseeable event due to Mr. Oguntodu's warning to Defendant Painter, C.G.'s statement of intention to kill Mr. Oguntodo made to Defendant Painter, upon information and belief both of which were

relayed by Defendant Painter to Defendant Peterson, and the fact that Mr. Oguntodu's cell window was covered the entire day, which was common during inmate-on-inmate assaults.

109. Mr. Oguntodu's injuries and death were directly and proximately caused by Defendants Painter and Peterson's deliberate indifference to Mr. Oguntodu's protection, health, and safety.

110. As a result, Plaintiff is entitled to recover all actual damages allowed by law. Plaintiff contends the Defendants' conduct constitutes malice, evil intent, or reckless or callous indifference to Mr. Oguntodu's constitutionally protected rights. Thus, Plaintiff is entitled to punitive damages against Defendants Painter and Peterson.

111. As a direct and proximate result of the occurrence which made the basis of this lawsuit, Plaintiff was forced to suffer:

    a. Actual damages;
    b. Loss of affection, consortium, comfort, financial assistance, protection, and care;
    c. Pain and suffering and mental anguish suffered by Mr. Oguntodu prior to his death;
    d. Mental anguish and emotional distress suffered by Plaintiff;
    e. Loss of quality of life;
    f Funeral and burial expenses;
    g. Loss of service;
    h. Loss of earnings and contributions to Plaintiff;
    i. Prejudgment interest; and
    j. Post judgment interest.

112. Pursuant to 42 U.S.C. § 1983 and § 1988, Plaintiff seeks to recover, and requests the award of punitive damages, reasonable attorney's fees, and costs of court.

# VII.
# ATTORNEYS' FEES

113. If Plaintiff prevails in this action, by settlement or otherwise, Plaintiff is entitled to and hereby demands attorney's fees under 42 U.S.C. § 1988.

# VIII.
# JURY REQUEST

114. Plaintiff respectfully requests a jury trial.

# PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that judgment be rendered against Defendants, for an amount in excess of the jurisdictional minimum of this court. Plaintiff further prays for all other relief, both legal and equitable, to which Plaintiff may be justly entitled.

Respectfully submitted,

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Texas Bar No. 00797196

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com

COUNSEL FOR PLAINTIFF