## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **MARY OGUNTODU** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **C.A. No. 7:21-CV-00011** |
| | § | |
| **KARA PAINTER, et al.** | § | |
| *Defendants.* | § | |
| | § | |

---

### APPENDIX TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Exhibit A:    Emergency Action Center Report, I-00895-01-19, with business record affidavit, Appendix 001 - 037;

Exhibit B:    Deposition Excerpts of Kara Painter, Appendix 038 – 076;

Exhibit C:    Surveillance Video, Appendix 077.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **MARY OGUNTODU** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **C.A. No. 7:21-CV-00011** |
| | § | |
| **KARA PAINTER**, et al. | § | |
| *Defendants.* | § | |

---

**EXHIBIT TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

# Exhibit A

Emergency Action Center Report, I-03957-03-19, with business record affidavit, **Appendix 001 – 037.**

DECLARATION OF Sandra Migura

"I am over 21 years of age, of sound mind, capable of making this declaration, and personally acquainted with the facts herein stated.

I am the custodian of records for the Emergency Action Center, a part of the Texas Department of Criminal Justice (TDCJ) located in Huntsville, Texas. Attached are true and correct copies of *any/all EAC records related to inmate Oguntodu, Joseph TDCJ #01728590 from March 1, 2018 to present*, which are kept by the TDCJ in the regular course of its business activity. The entries of such records were made as a regularly conducted activity and a regular practice of the TDCJ, and were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters.

My name is Sandra A. Migura and I am an employee of the TDCJ, a governmental agency. I am executing this declaration as part of my assigned duties and responsibilities. I declare under penalty of perjury that the foregoing is true and correct."

Executed in Walker County, State of Texas, on the 28th day of April, 2021.

Sandra A. Migura
EAC Administrator
Emergency Action Center
Texas Department of Criminal Justice

AD-02.15 (rev. 12)
Attachment A
Page 1 of 10

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
### Administrative Incident Review

APR 0 4 2019

EAC  cd

MAR 2018
REGION V
DIRECTORS
OFFICE

Incident Number: I-03957-03-19 JA
Location: HSD2-22 Cell
Date: 03/07/19 1826

**TO:** Emergency Action Center

**THRU:** Mr. David Blackwell, Region V Director

**SUBJECT:** Offender Death (Homicide)

## PERSONS INVOLVED:

**(Victim)** – Offender Joseph Oguntodu (TDCJ #1728590) was a B/M/35/L3/G5 offender who had served 8 years, 6 months, and 4 days of a 10-yr. sentence from Dallas County for Indecency with a Child under the Age of 17. He had one conviction and was G5 custody. He was double-celled at the time of the incident and had no STG indicators. He carried a Psychiatric Indicator of 1AH, not on Psych Caseload, with 91.89% compliance with meds.

**(Assailant)** – Offender Christopher De La Garza (TDCJ #2028191) is a H/M/31/L3/G5 offender who has served 4 years, 7 months, and 25 days of a 25-yr. sentence out of Dallas County for Aggravated Robbery with a Deadly Weapon. He has ten convictions and is G5 custody. He was double-celled at the time of the incident and was referred to STG at intake. He carries a Psychiatric Indicator of 2BT, is on Psych Caseload, with 91.89% compliance with meds.

## INJURIES (if serious):

Offender Oguntodu is deceased. His remains had several bruises on the chest and head. He showed swelling on his head and had a wound on the back of his head. Offender Oguntodu had ligature marks around his neck and blood in several places on his face, hands, and head. At this time the specific cause of death is unknown, pending completion of an autopsy.

## SUMMARY:

At approximately 1826 hours on 03/07/19, CO3 Dakota Schmidt was conducting security rounds on HSD-Pod after assuming his post. Upon arriving at HSD2-22 cell, offender De La Garza (Assailant) called Officer Schmidt to the door claiming he had killed his cellmate. Officer Schmidt attempted to communicate to offender Oguntodu (Victim), but received no response. Offender De La Garza pulled offender Oguntodu from the bottom bunk onto the floor claiming he had killed his cellmate. Officer Schmidt called for Sgt. William Barry on the radio and HSD Pod Rover, CO3 Omotolu Okungade, responded to the cell door. At 1829 hours Sgt. Barry arrived and initiated the Incident Command System on an unresponsive offender. Offender De La Garza was placed in hand restraints and removed from the cell.

Appendix - 002

Sgt. Barry and Officer Schmidt entered the cell. Offender Oguntodu was laying halfway off his bunk unresponsive with a ligature loosely hanging around his neck. At 1832 hours Lieutenant Jason Tedford and Licensed Vocational Nurse (LVN) Franklin Lee arrived and assessed the offender. At 1835 hours Lt. Teldford radioed Central Control to call the Emergency Medical Services (EMS) 911. After laying the offender on the floor for further assessment, LVN Lee found a faint but palpable pulse. While staff was retrieving a back board to place the offender onto the gurney, LVN Lee observed the offender's nailbeds dark gray and became pulseless. LVN Lee began Cardio-Pulmonary Resuscitation (CPR) on the offender.  The offender was placed on the backboard, LVN Lee continued life savings measures, and the offender was transported to the 10 Building Emergency Bay via gurney. Lifesaving efforts continued by Registered Nurse (RN) Jarrett Kunkel, Lt. Tedford, and Major Nicholas Flood in 10 Medical Emergency Room.

Assistant Warden Elbert Holmes and Assistant Warden Andrea Lozada were both notified and responded.

At 1856 hours, Advance EMT paramedics arrived and assessed the offender. At 1907 hours EMS paramedics stopped CPR and pronounced offender Oguntodu deceased.

Office of Inspector General, Investigator Christina Hoschler was notified and responded to the unit. Investigators Richard McGrath and Greg Burt processed the scene while Investigator Christina Hoschler processed the remains and notified the local Justice of the Peace.

Precinct 4 Justice of the Peace (JP) Judy Baker arrived on the unit, reviewed the assessment of the EMS personnel, pronounced offender Oguntodu deceases as of 1907 hours, and ordered the transfer of the body to Tarrant County Medical Examiner for autopsy. Digital photographs were taken.

Carnes Funeral Homes was notified and Wichita Falls Mortuary Services was dispatched to provide the transport of the body to Tarrant County.

Chaplain Gary Redwine was notified and arrived on the unit. Attempts were made to notify the offender's next-of-kin Ms. Mary Oguntodu (Mother) and emergency contact Mr. Campbell Read (Friend) but unsuccessful. On 03/09/19 Chaplain Redwine notified Ms. Mary Oguntodu and declined to claim the remains.

The Emergency Action Center (EAC) was notified and issued I-03957-03-19 number to the incident.

Warden Holmes attempted to interview offender De La Garza but advised by OIG Investigators to cease the interview. Offender De La Garza was housed in 12FF-79 cell as a 3A custody offender, after receiving a pre-segregation screening the evening of the event. Offender De La Garza was written a disciplinary case for a Level 1, 10.0 – Felony (Murder) charge MA#20190166802.

OIG Lead Investigator Hoschler stated case #1900002967 was issued to the incident investigated as a Homicide.

Video surveillance footage of the pod was reviewed.  Due to the placement of cameras, there is no direct view into HSD2-22 cell.  No abnormalities could be discerned in the activity at the cell door.  All activities, to include feeding and the passing of medications to the offenders, were

completed as normal. The last time offender Oguntodu can be seen to exit the cell is on 03/05/19 at 1919 hours, when staff performed an Integrity Check of the cell. Offender Oguntodu made no indication of distress or claim of endangerment during that inspection. Neither offender turned out to outside recreation when offered nor exits the cell until 03/07/19 when staff found offender Oguntodu unresponsive.

Interviews with offenders assigned to the pod to include offender janitors were conducted.

Offender Alfredo Valle #749497 (Janitor) entered HSD-Pod to assist the officer in picking up trays and were running late, because there had just been a use of force against the offender in HSD2-30 cell. The offender claimed not paying attention to the cells as they worked, didn't notice anything different or wrong on the pod, nor overheard anything to indicate any problems.

Offender Ernesto Pena #1362531 (Janitor) assist staff in the lunch feeding process and noticed nothing while feeding. However, while waiting to be stripped out to leave the pod, offender Pena states that he overheard a portion of a yelled conversation between the offender in D222 and another cell. At that time, the other party asked, "So, your cellie is a sex offender?" to which the Hispanic in 222 cell replied, "Yeah." The other person asked, "Y'all fighting, or you gonna kill him, or what?" and the Hispanic simply stated, "Nah, I don't wanna talk about it."

Offender Gabriel Cerda #1927132 and offender Dantwon Henderson #1650328 (Janitors) were observed on video surveillance footage in HSD pod. The offenders claimed anything unusual and nothing said by anyone on the run.

Offender James Hubbard #1992406 (Janitor) remembered talking to offender Oguntodu about his desire to procure a study Bible. Offender Hubbard stated that the offender was, "troubled," but he could not discern about what. Offender Hubbard claimed the cell was always kept dark and remembers offender De La Garza being in the cell, and standing back by the bunks when talking to offender Oguntodu. Offender did not observed any problems between the offenders.

HSD2-21B – Juan Virella (TDCJ #1916915) reports that the Hispanic offender (De La Garza) was always at the cell door but never saw the Black offender. It seemed the pair were okay together and claimed that his cellmate (Sam, Jamil #1804663) would often talk to them.

HSD2-21T – Sam, Jamil (TDCJ #1804663) claims to have never spoken to either offender in D2-22 cell, believes offender Oguntodu was homosexual stating "I don't mess with punks;" and didn't know if offender De La Garza spoke English.

HSD2-20T – Jones, Gabriel (TDCJ #2180224) claimed a close kinship with offender Oguntodu due to having experienced similar circumstances. He then alleged that offender Oguntodu had been trying to get out of the cell for weeks, pleading with every staff member who came by his door and attempting to file OPIs on a daily basis. Offender Jones believes that the offenders in HSD222 were a homosexual couple, but that it was not a healthy relationship. He claims to have heard banging on the wall, the day of the incident, sometime before the lunch meal.

HSD2-24B – Rollerson, Carlos (TDCJ #2103553) admitted to buying offender De La Garza's Hypercaloric Snack Sandwiches regularly, and claims that he was trying to help offender Oguntodu adjust to the penitentiary life. He describes the pair of offenders as reasonably quiet and normal until the replacement of offender Oguntodu's ID card. Offender Oguntodu began to be abused, appearing to have black eyes and bruises on his face after regaining access to the Commissary. Offender Rollerson attempted to intervene, but to no effect. He observes that

offender De La Garza always kept the cell dark, and was usually very non-confrontational with staff. However, on the morning of the event (03/07/19), offender De La Garza engaged in a loud and very abusive exchange with Officer Painter when she ordered him to clear his cell door windows while making medication pass. This act seemed an unusual departure from his normal behavior, and offender Rollerson feels that it may indicate that the offender had either already attacked offender Oguntodu or that he had decided to do so. Following the event, offender Rollerson heard another offender spoke to offender De La Garza while they were in holding cells awaiting interview. Offender De La Garza confessed to having killed offender Oguntodu.

HSD2-24T – Engleton, Brian (TDCJ #1849139) claimed offender De La Garza buys medication from other offenders in the area, and was generally considered to be, "A little bit crazy." He concurred with offender Rollerson's account of events in HSD2-22, including the altercation with Officer Painter. He added, however, that he recalled offender Rollerson telling him that he had heard offender De La Garza pacing in the cell and heard him mutter, "I just killed my cellie." Offender Rollerson's interview did not corroborate this.

1st Shift staff assigned to HSD Pod on 03/07/19 were interviewed. CO5 Kara Painter and CO3 Julio Varela were assigned to the 1st half of the 1st shift (0630-1230 hours). Officer Varela claimed having offenders give a verbal response when conducting counts/rounds and providing offenders with their own trays during feedings. Officer Painter claimed while escorting the nurse to pass medication, Officer Painter ordered the offenders in D222 to uncover the cell door but one offender told her he was in the toilet and to place the medication in the slot. Officer Painted informed him she was not going to open the slot until the window was uncovered but the offender verbally refused his medication and the escort continued. At 0830 hours Officer Painter attempted to count offenders in D222 but the window was covered. After knocking on the door an offender stated "two times," she noted the count sheet and continued with her count. After verifying her count with Officer Varela she went upstairs to check D222 and observed the Hispanic offender standing at the toilet and the Black offender climbing onto the top bunk. Officer Painter claimed making offenders move to get their trays during feedings/counts and recalled feeding the lunch meal to both offenders in D222.

CO3 Daniel Smith and CO3 Cheteigra Peterson were assigned to the 2nd half of 1st shift (1230-1830 hours) Officer Smith claimed conducting security rounds by himself due to Officer Peterson's refusal to complete security rounds. Officer Smith claimed during the dinner meal offender De La Garza was at the window with the other window covered. Officer Smith ordered the offender to uncover the window but the offender refused. Officer Smith claimed opening the cell slot and passing 2 trays into the cell. Officer Smith claimed at 1806 he performed his last security round and offender De La Garza was at the cell door. Officer Smith claimed the offender did not make him aware of anything and everything looks normal. Officer Peterson did not make a statement and resigned.

Appendix - 005

**EMPLOYEE ACTION OR INACTION:**

Staff failed to follow proper procedures by conducting security checks at least once every 30 minutes on an irregular schedule to verify all offenders for injury, illness and prohibited behavior; and failed to verify living, breathing bodies during counts in accordance to PO-07.023 "Cellblock Officer."

During the review of supervisory PREA/Security Rounds it was noted that supervisors documented and conducted rounds in the housing area; however, video surveillance revealed that a complete PREA/Security Round of offender housings were not completed.

All responding staff actions were appropriate and within policy at the time of the incident. All employee inactions were addressed at the administrative level. All staff involved were offered C.R.I.S.P. assistance.

**CORRECTIVE ACTION TAKEN:**

- Offender De La Garza was charged with the appropriate disciplinary and placed in Administrative Segregation Security Detention.
- CO5 Kara Painter received four PERS-325 "Employee Disciplinary and Prehearing Investigation" for failing to conduct proper security checks. Termination was recommended during the employee's disciplinary hearing.
- CO3 Julio Varelainosencio received three PERS-325 "Employee Disciplinary and Prehearing Investigation" for failing to conduct proper security checks. The employee has been scheduled for hearing.
- CO3 Daniel Smith received two PERS-325 "Employee Disciplinary and Prehearing Investigation" for failing to conduct proper security checks and allowing offenders to cover the windows. Probation and suspension was recommended during the employee's disciplinary hearing.
- CO3 Cheteigra Peterson received four PERS-325 "Employee Disciplinary and Prehearing Investigation" for failing to conduct proper security checks. Officer Peterson resigned during the prehearing investigation and termination was recommended during the hearing.
- Lt. Roberto Reyes received a PERS-325 "Employee Disciplinary and Prehearing Investigation" for failing to correctly perform a documented PREA Rounds. Probation and suspension was recommended during the employee's disciplinary hearing.
- Sgt. Jason Miller received a PERS-325 "Employee Disciplinary and Prehearing Investigation" for failing to correctly perform a document Supervisor Round. Probation and suspension was recommended during the employee's disciplinary hearing.

AD-02.15 (rev. 12)
Attachment A
Page 6 of 10

**NOTIFICATIONS:**

Regional Director – David Blackwell                         1915

Senior Warden – Jimmy Smith                                1905

Asst. Warden – Elbert Holmes                               1900

Asst. Warden – Andrea Lozada                               1850

Duty Warden – Major Nicholas Flood                         1830

OIG – Investigator Christina Hoschler                      1850

Chaplain – Gary Redwine                                    2002

Pct. 4 Justice of the Peace – Judy Baker                   1930

EAC – Self-submitted by Lt. Kenneth Adams                  2324 (due to determination of Homicide)

## ADMINISTRATIVE REVIEW:

I.    Warden or Administrative Supervisor Comments:

Offender De La Garza made a statement to COIII Schmidt alleging he had killed his cellmate, then staff discovery occurred. Offender Oguntodu was removed from HSD2-22 immediately upon discovery and within security protocol. Lifesaving efforts were started immediately upon medical suggestion based on second vital check. Correctional staff and medical staff performed lifesaving efforts until determined that efforts were no longer effective. Final determination of the specific cause of death is still pending the completion of an autopsy. Evidence and injuries do support that violence was a contributing factor, that offender De La Garza created the environment which cause the death of offender Oguntodu.

It was noted during the classification review that offender De La Garza and offender Oguntodu were housed within the Safe Prisons recommendation. Offender De La Garza was 25 years old, 5'4" and 140 lbs. Offender Oguntodu was 35 years old, 5'10" and 175 lbs. in weight. Offenders were in compliance with the Classification Plan.

Correctional staff and medical response was noted to be within protocols after discovery. Incident Command System was not immediately initiated by Officer Schmidt upon discovery of the situation. Sgt. Barry responded to the affected housing area upon notification by radio by Officer Schmidt without any noted adverse effects. Taking Officer Schmidt's reaction to an offender telling him of the death of a cellmate, in account, may have affected his ability to initiate the ICS. Medical response was in a timely manner and medical staff allegedly were able to measure vitals from the offender. A second check of vitals prompted all staff to begin lifesaving efforts.

Integrity checks and cell searches were all conducted within policy. Review of the video surveillance for the 24 hours prior to the incident revealed that Security Checks were not performed within the required 30-minute irregular time interval outlined in PO-07.006 "Cellblock Officer." Proper identification of offenders during count time did not occur appropriately. Feeding procedures need to be reinforce to ensure both offenders in a cell are identified to receive meals. Instances of offenders covering cell lights and fixtures without Correctional Staff action was identified. Instances of Correctional Supervisors not documenting or conducting rounds appropriately were identified, but did not contribute to the incident. However, all listed deficiencies contributed to substandard discovery of the incident, which does not support the Agency mission.

Corrective action through addressing employee violations by PD-22, "General Rules of Conduct and Disciplinary Action," will occur. Correctional Administrators on the facility are reviewing the application of methods that support policy requirements to ensure the Agency's mission is being met.

Offender De La Garza, Christopher TDCJ #2028191 Due Process Hearing #20190166802 resulted in 15 days recreation, 60 days commissary, remain L3, and 1 day of goodtime loss. The offender only had one day of goodtime to take and other punishment was defined by the offender's status. The Office of Inspector General issued criminal case #1900002967 to the incident. Upon its completion the case will be presented to the appropriate District Attorney's Office for review by the Grand Jury and the appropriate courts.

Signature & Date _____ 3/27/19 _____

Elbert Holmes, Assistant Warden

II.     Regional Director, PFCMOD Deputy Director of Operations, or Department Head
Comments:

Signature & Date_____

**ATTACHMENTS:**

1. Emergency Action Center Telex  I-03957-03-19
2. Staff Statements:
   - Assistant Warden Elbert Holmes
   - Lt. Jason Tedford
   - Sgt. William Barry
   - CO4 Tommy Ware
   - CO3 Dakota Schmidt
   - CO3 Omotolu Okungade
   - CO4 Noe Zuniga
   - CO4 Ayodele Akintunde
   - LVN Franklin Lee
   - CO5 Kara Painter
   - CO3 Julio Varela
   - CO3 Daniel Smith
3. Offender Interview Summaries
4. Photos:  Oguntodu, Joseph (TDCJ #1728590)
5. RM-03:  Oguntodu, Joseph (TDCJ #1728590)
6. RM-04:  Oguntodu, Joseph (TDCJ #1728590)
7. Offenders Travel Cards:
8. Classification Profile Reports
9. OIG Investigator's Report of Custodial Death
10. TDCJ Death Packet Documentation:
    - Chaplain's Death Notification Email
    - Transport Order
    - Autopsy Order (OIG)
    - Personal Property Receipts
    - Chaplain's Letter to Family
    - Personal Property Letter
11. Clinical Notes
12. Offender History Briefing
13. I-47 Disciplinary Hearing Report (MA#20190166802)
14. I-169 Administrative segregation Initial Placement & Notification form
15. Timelines for HSD-Pod and staff
16. ECB Door Report (02/07/19 – 03/07/19)
17. Cell Search Documentation
18. Integrity Check Documentation
19. Offenders Demographic Sheet

Date: **March 29, 2019**

**Administrative Incident Review**

**James V. Allred Unit: I-03957-03-19**

**Regional Director's Comments:**

**Synopsis of incident:** On March 17, 2019, CO III, Dakota Schmidt was conducting security rounds and came upon HSD2-22 cell where Offender Christopher De La Garza #2028191 claimed he had killed his cellmate Offender Joseph Oguntodu #1728590. Officer Schmidt attempted to communicate to Offender Oguntodu, but received no response. Offender De La Garza pulled Offender Oguntodu from the bottom bunk onto the floor claiming he had killed his cellmate. Officer Schmidt called for additional staff. Sergeant William Barry arrived and initiated the Incident Command System. Offender De La Garza was placed in restraints and removed from the cell. Offender Oguntodu was laying halfway off his bunk unresponsive with a ligature loosely hanging around his neck. Licensed Vocational Nurse Franklin Lee arrived and assessed Offender Oguntodu. At 1935 hours Lieutenant Jason Tedford radioed Central Control to call 911. LVN Lee began Cardio-Pulmonary Resuscitation on the offender. Offender Oguntodu was placed on the backboard, and LVN Lee continued life saving measures on the way to 10 Building Emergency Bay. At 1856 hours, Advance EMT paramedics arrived and assessed Offender Oguntodu. At 1907 hours, EMS paramedics stopped CPR and pronounced Offender Oguntodu deceased. Office of the Inspector General, Investigator Christina Hoschler was notified and responded to the unit. Chaplain Gary Redwine was notified and arrived on the unit. Attempts were made to notify the offender's next-of-kin Ms. Mary Oguntodu (mother) and emergency contact Mr. Campbell Read (friend). On March 9, 2019 Chaplain Redwine notified Ms. Mary Oguntodu and she declined to claim the remains. Warden Holmes attempted to interview Offender De La Garza, but was advised by OIG Investigators to cease the interview. Offender De La Garza was written a disciplinary case for a Level 1, 10.0 Felony (Murder) charge. Due to the placement of cameras, there was no direct view into HSD-22 cell. The last time Offender Oguntodu can be seen to exit the cell is on March 5, 2019 at 1919 hours, when staff performed an Integrity Check of the cell. Offender Oguntodu made no indication of distress or claim of endangerment during that inspection. Neither offender turned out to outside recreation when offered, nor exits the cell until March 7, 2019 when Offender Oguntodu was found unresponsive. 1st shift staff assigned to HSD Pod on March 7, 2019 were interviewed. CO V, Kara Painter and CO III, Julio Varela were assigned to the 1st half shift. Officer Painter claims while escorting the nurse to pass medication she ordered the offenders in D222 to uncover the cell door, but one offender told her he was in the toilet and to place the medication in the slot. Officer Painter informed him she was not going to open the slot until the window was uncovered, but the offender verbally refused his medication and the escort continued. At 0830 hours, Officer Painter attempted to count offenders in D222, but the window was covered. After knocking on the door an offender stated "two times", she noted the count sheet and continued with her count. After verifying her count with Officer Varela she went upstairs to check D222 and observed the Hispanic offender standing at the toilet and the black offender climbing onto the top bunk. Officer Painter claims making offenders move to get their trays during feedings/counts and recalled feeding the lunch meal to both offenders in D222. CO III, Daniel Smith and CO III, Cheteigra Peterson were assigned to the 2nd half of 1st shift. Officer claims conducting security rounds by himself due to Officer Peterson's refusal to complete security rounds. Officer Smith claims during the dinner meal Offender De La Garza was at the window with the other window covered. Officer Smith ordered the offender to uncover the window, but the offender refused. Officer Smith claims opening the cell slot and passing 2 trays into the cell. Officer Smith claims at 1806 hours, he performed his last security round and Offender De La Garza was at the cell door. Officer Smith claims Offender De La Garza did not make him aware of anything and everything looked normal. Officer Peterson did not make a statement and resigned.

**Employee Action/Inaction:** Staff failed to follow proper procedures by conducting security checks at least once every 30 minutes on an irregular schedule to verify all offenders for injury, illness and prohibited behavior; and failed to verify living, breathing bodies during counts in accordance to PO-07.023 "Cellblock Officer". During the review of supervisory PREA/Security Rounds it was noted that supervisors documented and conducted rounds

**Appendix - 012**

in the housing area; however, video surveillance revealed that a complete PREA/Security Round of offender housings were not completed. All responding staff actions were appropriate and within policy at the time of the incident. All employee inactions were addressed at the administrative level. All staff involved were offered C.R.I.S.P. assistance.

**Corrective Action:** CO V, Kara Painter received four PERS-325 "Employee Disciplinary and Prehearing Investigation" for failing to conduct proper security checks. Termination was recommended during the employee's disciplinary hearing. CO III, Julio Varela received three PERS-325 "Employee Disciplinary and Prehearing Investigation" for failing to conduct proper security checks. The employee has been scheduled for hearing. CO III, Daniel Smith received two PERS-325 "Employee Disciplinary and Prehearing Investigation" for failing to conduct proper security checks and allowing offenders to cover the windows. Probation and suspension was recommended during the employee's disciplinary hearing. CO III, Cheteigra Peterson received four PERS-325 "Employee Disciplinary and Prehearing Investigation" for failing to conduct proper security checks. Officer Peterson resigned during the prehearing investigation and termination was recommended during the hearing. Lt. Roberto Reyes received a PERS-325 "Employee Disciplinary and Prehearing Investigation" for failing to correctly perform a documented PREA Rounds. Probation and suspension was recommended during the employee's disciplinary hearing. Sgt. Jason Miller received a PERS-325 "Employee Disciplinary and Prehearing Investigation" for failing to correctly perform a document Supervisor Round. Probation and suspension was recommended during the employee's disciplinary hearing.

**Comments:** The James V. Allred Unit Correctional Staff responded swiftly and within Agency policy and procedure when advised of an unresponsive offender. The offender was provided with medical attention. Corrective action through addressing employee violations by PD-22 "General Rules of Conduct and Disciplinary Action," will occur. Correctional Administrators on the facility are reviewing the application of methods that support policy requirements to ensure the Agency's mission is being met. The Office of the Inspector General issued criminal case #1900002967 to the incident. Upon completion the case will be presented to the appropriate District Attorney's Office for review by the Grand Jury and the appropriate courts.

_____          3-29-19
**REGIONAL DIRECTOR'S SIGNATURE**        **DATE**

**Appendix - 013**



# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## Correctional Institutions Division

### Inter-Office Communications

| | | | |
|---|---|---|---|
| **To:** | Regional Incident Review | **Date:** | 03/07/19 |
| **From:** | Elbert Holmes, Asst. Warden<br>James V Allred Unit | **Subject:** | Offender Death (Homicide)<br>I-03957-03-19 |

On 03/07/2019, at 1843 hours Major David West contacted me informing me of an offender found inside cell D-Pod 222 in ECB unrespondsive inside the cell. Major West advised me that the offender had a ligature tied around his neck, and life saving measures were taking place. I advised Major West I will be in route to the unit. I arrived to the unit and went to the location of the incident. I went to the cell and took photos from the run never making entry inside the cell. I then went to interview Christopher DeLa Garza #2028191 in the UCC room of ECB, who was the then cell mate of offender Joseph Oguntodu #1728590. During the interview with offender DeLa Garza, he only said he was defending himself, after I told him the cell looks like an altercation took place. Offender DeLa Garza would not go into detail of how he defended himself. I then conducted an interview with offender Ortavious Johnson #2137541. Offender Johnson only stated that the offenders on the pod knew something was wrong because no one was talking. During my interview with offender Carlos Rollerson #2103553, he stated the black offender was gay. While in the process of interviewing offender Rollerson, I was instructed by OIG to hault all offender interviews at this point.

**Appendix - 014**

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## CORRECTIONAL INSTITUTIONS DIVISION

## INTER-OFFICE COMMUNICATION

TO:   Captain Rodney Wariner                    Date:  03/07/2019

FROM:  Lieutenant Jason Tedford                 Subject: As stated

On 03/07/2019 at approximately 1830 hours I responded to an ICS event that was taking place on ECB D pod 222 where an Offender was not responsive. Upon entering ECB D pod Offender De La Garza, Christopher # 2028191 was in hand restraints on the wall. I entered D-222 cell where I immediately noticed Offender Oguntodu, Joseph # 1728590 was laying halfway off his bunk with a ligature loosely hanging around his neck. I also saw blood on the bottom bunk, Offender Oguntodu's face, back of his head and state issued jumper. I immediately radioed for the General Population Central Control to call ems and was about to being life saving measures when LVN Lee entered the cell. LVN Lee screened the offender as we awaited the arrival of additional medical staff. LVN Lee then stated there was no pulse at which time he started chest compressions. A backboard arrived and I helped place Offender Oguntodu on the backboard and then on the gurney. LVN Lee continued to do chest compressions until he was relieved by LVN Provost. Offender Oguntodu was then transported via gurney to 10 building medical where lifesaving efforts were continued by Major Nicholas Flood. I then replaced Major Flood and did chest compressions until EMS staff arrived at which time it was determined by EMS to cease lifesaving efforts.

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## CORRECTIONAL INSTITUTIONS DIVISION

### INTER-OFFICE COMMUNICATION

Date:  3/8/2019

TO:

Subject:

FROM:  William Barry, Sergeant

At approximately 6:26 PM on 3/7/2019, I was called to HS D Pod 222 cell by COIII Dakota Schmidt. Upon arrival, I discovered that Offender Delagarza #2028191 had assaulted his cell mate, Offender Joseph Oguntodu #1728590. I initiated ICS, Offender Delagarza was removed from the cell and myself and Officer Schmidt entered the cell. Offender Oguntodu was not responsive to any questions or commands from myself or Officer Schmidt. LVN Lee arrived on scene, very quickly followed by Lieutenant Jason Tedford. LVN Lee checked Offender Oguntodu for a pulse and stated that while it was faint that Offender Oguntodu had a pulse. LVN Lee continued monitoring Offender Oguntodu for a pulse as we awaited the backboard, gurney, and life-saving response kit. When LVN Lee observed that Offender Oguntodu no longer had a pulse, he immediately began chest compressions. Upon the arrival of the backboard and gurney, myself , Officer Tommy Ware COIV and LVN Lee placed Offender Oguntodu on the backboard and assisted in moving him to the gurney on the run outside the cell. Myself, Lt. Tedford, Captain Rodney Wariner, Officer Ware, Officer Akintunde, Officer Zuniga and LVN Lee escorted Offender Oguntodu off of the pod. At that point, I was separated from the group trying to maintain control of the crime scene. Offender Oguntodu was escorted out of High Security to 10 Building Medical at which point I returned to my normal duties.

Sgt. William Barry

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## CORRECTIONAL INSTITUTIONS DIVISION

## INTER-OFFICE COMMUNICATION

TO:                                                    Date:  3/7/2019

FROM:  TOMMY WARE COIV                         Subject:

---

On 3/7/2019 at approximately 6:26 PM, I, Ware, Tommy COIV responded to an ICS in Delta Pod Cell 222. I assisted Sgt. Barry and LVN Lee placing Offender Joseh Oguntodu 1728590 on to the back board and placed him on the gurney. Officer Zuniga COIV and I escorted the gurney with the offender to Medical. LVN Lee was administering chest compressions. We arrived at 10 Building Medical and I was relieved by medical staff and I returned to normal duty on ECB.

Tommy Ware

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## CORRECTIONAL INSTITUTIONS DIVISION

## INTER-OFFICE COMMUNICATION

TO:                                      Date:   3/7/2019

FROM: DAKOTA SCHMIDT COIII              Subject:

---

   During Shift Change I arrived to D pod ECB after arriving on the pod I went to put my stuff down of the table and went to do my first security check. I started on 2 row and as I was doing my check the offender in cell 222 wanted to talk to me so I went to talk to him. He told me he killed his cellmate. After he told me that he killed his cellmate, I tried to get a response from the cellmate that is when the offender threw the cellmate off the bunk to the floor and he said again that he killed his cellmate. After that I called for Sgt. Barry to come to my location. Sgt. Barry got to the cell, he initiated ICS. Then once they got the offender to the backboard I helped put the offender on to the gurney. It should be noted that the time was 1826 when this occurred.

Dakota Schmidt COIII

*Schmidt*

Appendix - 018

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## CORRECTIONAL INSTITUTIONS DIVISION

## INTER-OFFICE COMMUNICATION

Date: 3/8/2019

TO:

FROM: Omotolu Okungade COIII     Subject:

On 3/7/2019, Officer Schmidt initiated called me to the 2nd while I just finished the security checks in the 1st row. On getting to the 2nd row Cell 222, I saw Offender Oguntodu partly on the floor and on his bed while his Offender cellmate was sitting beside him comfortably. I wanted to initiate ICS. Officer Schmidt told me he had called Sgt. Barry.

Sgt. Barry came into D-Pod immediately and initiated ICS.

Offender Oguntodu was whisked away by medical personnel.

I returned to my duty post thereafter.

Omotolu Okungade COIII

TEXAS DEPARTMENT OF CRIMINAL JUSTICE
CORRECTIONAL INSTITUTIONS DIVISION

## INTER-OFFICE COMMUNICATION

Date:  3/8/2019

TO:

Subject:

FROM:  Zuniga, Noe COIV

At 18:26 hrs, I, Officer Zuniga, Noe COIV responded to ICS on HSD222 cell door and as I retrieve with the gurney and board and places the Offender Oguntodu, Joseph TDCJ #1728590 on the gurney with the nurse doing CPR on two row HSD Row and as I lead the gurney with the nurse to 10 building as we waited for the EMTS to aroved to 10 buildge an, I returned to my normal duties.

Noe Zuniga COIV

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## CORRECTIONAL INSTITUTIONS DIVISION

## INTER-OFFICE COMMUNICATION

TO:                                    Date:   3/7/2019

FROM:  Akintunde, Ayodele COIV                Subject:

I, Officer Akintunde COIV respond to ICS on D-Pod Cell #222 Offender was on the floor and CPR was being administer on said offender.

I Officer Akintunde did operate video coverage on all activites been taken from his cell to medical (10 bldg)

Video coverage was stop on the way to 10 bldg and I officer Akintunde return to my normal duty. Noe Zuniga COIV

*Akintunde A.*

TEXAS DEPARTMENT OF CRIMINAL JUSTICE
CORRECTIONAL INSTITUTIONS DIVISION

## INTER-OFFICE COMMUNICATION

TO: All Concerned

Date: 3/7/2019

FROM: Franklin Lee, LVN

Subject: Oguntodu, Joseph O. #1728590

On the above date between 1840 and 1845, I, Franklin Lee, LVN; was on my way from the 12 Building Sallyport to ECB to do a med pass at J Pod at ECB when I was redirected to D Pod at ECB for an unresponsive Offender. This LVN did not know that an ICS had been called until after I arrived at ECB, so I had no AED or jump bag with me at that time. In between 1845 and 1850 on the above date, I arrived at the Offender's cell on D Pod and he presented with bruising on the back of his head, a rope/cord wrapped around his neck, legs hanging on the bunk, and his upper body lying on the floor. The Offender was then laid on his back for further assessment, and found blood around his eyes, blood coming out of his nose, and had a faint but palpable pulse. This LVN then had the Officers get a backboard and stretcher so that he could be taken to Medical and eventually sent to the hospital for obvious head injuries. Then between 1850 and 1855 on the above date, the Offender's nailbeds when dark gray and became pulseless. CPR was started by this LVN. The Offender was placed on a backboard; and while loading the Offender onto the backboard, a chuck of what looked like either skin and bone or just bone fell off the back of the Offender's head. The Offender on the backboard was then placed on the stretcher; and this LVN continued to do CPR until I was relieved by my supervisor, Mr. J. Kunkel, RN; and from there, Mr. Kunkel took control of the situation from a medical standpoint.

Franklin Lee, LVN  3/7/2019

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## CORRECTIONAL INSTITUTIONS DIVISION

## INTER-OFFICE COMMUNICATION

TO:  Major Flood                                    Date:  03/08/19

FROM:  Officer K. Painter (CO4)                     Subject:  As stated

On 03/07/19, I was assigned to D-Pod with Officer Varela.  Officer Varela got the Rec List.  The Rec Crew arrived and put out Rec.  I was on the Rec Yard securing the offender the Rec Yards.  RN Smith from Medical showed and we ran Nurse Sick Call.  The pill nurse showed up and I escorted her while she passed medication.  Cell 222 had the cell door window covered.  I knocked on the door and ordered the offender to uncover their window.  An offender stated that he was on the toilet to just put the medication in the slot.  I replied that the slot wasn't going to open until the window was uncovered.  The offender VR'd his medication and we moved on.  At 0830 count, I knocked on every door and made every offender move.  I started count on 2-row, and cell 222 had his window covered. I knocked on the door and an offender said, "Two times."  I noted on my count sheet and finished my count.  I then asked officer Varela how many he had in cell 222. I then went to the back of the pod, went upstairs and walked by 222 cell again.  The window was uncovered.  The Black offender was standing at the toilet and the Hispanic offender was climbing into the top bunk.  We then brought Rec in off the Rec Yards.  The chow carts got there and we fed the pod.  When I feed G5 pods, both offender must move to get their trays.  2 trays went into 222.  Mr. Reeves and the plumbers came onto the pod and we rolled some doors so they could clear shower drains.  We then did the 1230 count.  Officer Varela did the roster count and I did the head count.  Everyone either moved or sounded off for the count.  We were then relieved by Officer Smith and Officer Peterson and we were assigned to HSG-Pod for the afternoon.

TEXAS DEPARTMENT OF CRIMINAL JUSTICE
CORRECTIONAL INSTITUTIONS DIVISION

## INTER-OFFICE COMMUNICATION

TO:    EAC                                    Date: 03/08/2019

FROM: CO III Julio Varela                     Subject: As Stated

On 03/07/2018 I, Officer Julio Varela, was assigned to ECB D-Pod for the first part of the shift. To my recollection everything about the shift was as normal. During the shift I do remember two offenders being alive in D 222. Both offenders got their own trays and both offenders gave me a verbal response during my conducted counts. I always make the offenders get their own trays and say something to me when I count them. This is all the information I have.

Julio Varela

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## CORRECTIONAL INSTITUTIONS DIVISION

### INTER-OFFICE COMMUNICATION

---

TO:    EAC                                    Date: 03/08/2019

FROM: CO III Daniel Smith                     Subject: As Stated

---

I Officer Smith CO III crossed over from G-Pod to D-Pod on 03/07/2019. I checked all equipment while I waited for Officer Petterson to complete a security round on ECB D-Pod. After I checked the equipment, Offiicer Petterson informed me that she did not want to do any security rounds. I informed her that security rounds are important but she continued to refuse and state, "you wouldn't understand because you're a man". I Officer Smith started making security rounds at approximately 1330 hrs and continued to make them every 30 minutes. When chow arrived at 1540 hrs, I put all trays together for 2 row and began to feed the odd side of the pod. Officer Petterson came up to two row with me around the time I arrived at D 219. I was running low on trays so Officer Petterson went down the stairs and refilled the tray carrier and had the SSI bring the carrier back up to me. When I got to D 230, Offender Johnson took control of the food tray slot. I called for a supervisor and Sgt. David Vaccarella arrived around 1600. The offender told Sgt. Vaccarella he wasn't getting out of the slot no matter what and that he needed to be gassed. Sgt. Vaccarella then left and came back with a video camera and escorting officers. Sgt. Vaccarella gassed the offender and removed him from the cell. Around 1630 the situation was over and I continued normal activities. I arrived at D 222 the Hispanic offender was at the window. At the time half of the window was covered. I ordered the Hispanic offender to uncover the window and he failed to obey the order. I then opened the food slot and passed two trays into the cell. I forgot to bring up the hypo snack when serving the trays in and the offender was ok with me bringing it back up later. I did take the snack back to the cell around 1700 hrs. At that time the offender did not alert me about any problems. Then I continued to feed the rest of two row. After finishing feeding, I went down to one row. At this time Officer Petterson then began to help me. Officer Petterson and I arrived at D 128, I advised her that I would start picking up trays on two row. At approximately 1706 I arrived at D 222 again, opened the food slot and received two empty food trays from the Hispanic offender. The offender had still not said anything to me. Everything still looked normal to me. After picking up all food trays, I had the SSI clean both one row and two row of all the trash. Around 1730 I waited for count to be called but I never heard it called. I then did a complete round around 1806 hrs. When I came around D 222 the Hispanic offender was still standing in the window. At this time the offender still hadn't made me aware of any situation. I finished the paper work and made sure everything was done. This is all the information I have.

Officer Daniel Smith

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## CORRECTIONAL INSTITUTIONS DIVISION

### INTER-OFFICE COMMUNICATION

TO: Emergency Action Center                Date: 03/10/19

FROM: Major Nicholas Flood, JA - EC         Subject: Offender Janitor Interviews (pg. 1)

The following are summations of interviews conducted by Major Nicholas Flood with the specified offender Janitors from the Expansion Cellblock regarding events of 03/07/19:

18R-38 Valle, Alfredo (TDCJ #749497)
Offender Valle entered HSD-Pod to assist the officer in picking up trays. Business on the pod was running late, because there had just been a use of force against the offender in HSD2-30 cell. Offender states that Officer Smith and he were moving quickly to try to catch up, and so he wasn't paying any attention to the cells as they worked. In general, offender Valle didn't notice anything different or wrong on the pod, and overheard nothing to indicate any problems.

18S-43 Pena, Ernesto (TDCJ #1362531)
Offender Pena, who is usually working in the hallway, went to HSD-Pod to assist in the feeding process. He accompanied Officers Painter and Smith as they fed, and noticed nothing while feeding. However, while waiting to be stripped out to leave the pod, offender Pena states that he overheard a portion of a yelled conversation between the offender in D2-22 and another cell. At that time, the other party asked, "So, your cellie is a sex offender?" to which the Hispanic in 222 replied, "Yeah." The other person asked, "Y'all fighting, or you gonna kill him, or what?" and the Hispanic simply stated, "Nah, I don't wanna talk about it." It should be noted that, given information from the offender and video surveillance (that the offender left the pod at approximately 1704) and from Medical staff, who indicated that the state of the offender meant that he had been deceased for an extended period (over an hour) it is very likely that offender Oguntodo was dead at the time the conversation allegedly occurred.

4E-41B Cerda, Gabriel (TDCJ #1927132)
Offender Cerda is visible on video surveillance footage sweeping the walkway around the crime scene. During his interview, he stated that he neither saw nor heard anything unusual. There was no indication of any problem, and nothing said by anyone on the run to or around him.

7I-42T Henderson, Dantwon (TDCJ #1650328)
Offender Henderson is observable on the pod in the mid-morning hours, assisting with the Lunch meal. He states that he barely remembers having worked on the pod that day at all, and that nothing unusual sticks out in his memory about it.

**Appendix - 026**

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## CORRECTIONAL INSTITUTIONS DIVISION

## INTER-OFFICE COMMUNICATION

TO: Emergency Action Center

Date: 03/10/19

FROM: Major Nicholas Flood, JA - EC

Subject: Offender Janitor Interviews (pg. 2)

The following are summations of interviews conducted by Major Nicholas Flood with the specified offender Janitors from the Expansion Cellblock regarding events of 03/07/19:

18U-44 Hubbard, James (TDCJ #1992406)
Offender Hubbard remembered talking to the Victim about his desire to procure a study Bible. Offender Hubbard stated that the offender was, "troubled," but he could not discern about what. He remembers offender De La Garza being in the cell, and standing back by the bunks (he interpreted such action as a gesture of respect to give the other cellmate privacy). He observed that the cell was always kept dark, but thought nothing of it. He felt that the offenders were peacefully existing, and was taken aback to hear of offender Oguntodu's death.

Appendix - 027

TEXAS DEPARTMENT OF CRIMINAL JUSTICE
CORRECTIONAL INSTITUTIONS DIVISION

## INTER-OFFICE COMMUNICATION

TO: Emergency Action Center

Date: 03/09/19

FROM: Major Nicholas Flood, JA - EC

Subject: Neighbour Interviews (pg. 1)

The following are summations of interviews conducted by Major Nicholas Flood with the specified neighbouring offenders from the HSD-Pod regarding events of and prior to 03/07/19:

HSD2-21B – Juan Virella (TDCJ #1916915)
Offender reports that the Hispanic offender (De La Garza) was ALWAYS at the cell door, he never saw the Black offender. It seemed the pair were okay together though. Offender Virella claimed that his cellmate (Sam, Jamil #1804663) would often talk to them.

HSD2-21T – Sam, Jamil (TDCJ #1804663)
Offender claims to have never spoken to either offender in D2-22 cell (this contradicts the statement of his cellmate, Virella, Juan #1916915). Offender Sam believes that offender Oguntodu was homosexual, and states, "I don't mess with punks." Offender also claims that he didn't know if offender De La Garza spoke English.

HSD2-20T – Jones, Gabriel (TDCJ #2180224)
Offender Jones was very emotional, claiming that he felt a close kinship with offender Oguntodu, due to having experienced similar circumstances. He then alleged that offender Oguntodu had been trying to get out of the cell for weeks, pleading with every staff member who came by his door and attempting to file OPIs on a daily basis (this is not born out by evidence, as I personally spoke to offender Oguntodu last week while making Supervisory Rounds, and he gave no indication whatsoever that he was under duress or in danger. He asked the status of his replacement ID card and nothing more). Offender Jones believes that the offenders in HSD2-22 were a homosexual couple, but that it was not a healthy relationship. He claims to have heard banging on the wall, the day of the incident, some time before the lunch meal.

HSD2-24B – Rollerson, Carlos (TDCJ #2103553)
Offender Rollerson spoke at length about his relationship with offenders Oguntodu and De La Garza. He admitted to buying offender De La Garza's Hypercaloric Snack Sandwiches regularly, and claims that he was trying to help offender Oguntodu adjust to the penitentiary life. He describes the pair of offenders as reasonably quiet and normal until the replacement of offender Oguntodu's ID card. Upon regaining access to the Commissary, he says, offender Oguntodu began to be abused, appearing to have black eyes and bruises on his face. Offender Rollerson attempted to intervene obliquely, but to no effect. He observes that offender De La Garza always kept the cell (continued)...

Appendix - 028

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## CORRECTIONAL INSTITUTIONS DIVISION

## INTER-OFFICE COMMUNICATION

TO:  Emergency Action Center                     Date:  03/09/19

FROM:  Major Nicholas Flood, JA - EC              Subject:  Neighbour Interviews (pg. 2)

---

The following are summations of interviews conducted by Major Nicholas Flood with the specified neighbouring offenders from the HSD-Pod regarding events of and prior to 03/07/19:

(continued)...dark, and was usually very non-confrontational with staff. However, on the morning of the event (03/07/19), the offender engaged in a loud and very abusive exchange with Officer Painter when she ordered him to clear his cell door windows while making medication pass. This act seemed an unusual departure from his normal behavior, and offender Rollerson feels that it may indicate that the offender had either already attacked offender Oguntodu or that he had decided to do so. Following the event, offender Rollerson "heard on the run" another offender who allegedly spoke to offender De La Garza while he was in a holding cell awaiting interview. At that time, the unknown offender spoke to offender De La Garza and confessed to having killed offender Oguntodu. Due to the placement of video cameras for surveillance, this claim cannot be verified.

HSD2-24T – Engleton, Brian (TDCJ #1849139)
Offender Engleton claims that he thought of offender De La Garza as, "Doped up." He was alleged to be buying medication from other offenders in the area, and was generally considered to be, "A little bit crazy." He concurred with offender Rollerson's account of events in HSD2-22, including the altercation with Officer Painter. He added, however, that he recalled offender Rollerson telling him that he had heard offender De La Garza pacing in the cell and heard him mutter, "I just killed my cellie." Offender Rollerson's interview did not corroborate this, however.



# Texas Department of Criminal Justice

Bryan Collier
Executive Director

James V. Allred Unit
I-03957-03-19 Offender Homicide
24-Hour Timeline for HSD2-22 Cell

03/06/19:

**1759** Security Check - CO4 Susan Murphy

**1834** Security Check - CO4 Richard Alford, Jr.

**1932** 1930 Count - CO4 Alford

**1938** 1930 Count - CO4 Noe Zuniga, Jr.

**1944** Mail - CO4 Alford

**2002** Mail/Paperwork - CO4 Alford

During time between security rounds, activity on the pod engaged staff (necessity pass, integrity checks, etc.)

**2159** Round - Sgt. William Barry

**2220** 2230 Count - CO4 Tommy Ware (Talks to I/M in cell)

**2224** Security Check - CO4 Alford

**2231** SSI (Hubbard, #1992406) talks to cell 224 or 222

**2238** 2230 Count - CO4 Zuniga

**2331** Necessities passed to cell - CO4 Zuniga

**2336** SSI (Hubbard) talks to cell

03/07/19:

**0005** 0000 Count - CO4 Zuniga

**0018** 0000 Count - CO4 Alford

**0025** Med Pass - CO4 Alford/LVN Jennifer Phillips

**0054** 0100 Count - CO4 Zuniga

**0102** 0100 Count/Security Check - CO4 Alford

**0120** Security Check - CO4 Alford

**0159** SSI (Hubbard) talks to cell

**0206** Unknown action at slot - CO4 Alford

**0251** Talks to cell - CO5 Sue Pearson

**0254** Talks to cell - CO5 Pearson

**0326** Security check - CO4 Zuniga

(During the time between security rounds, activity on the pod engaged staff – feeding, integrity checks, etc.)

**0504** Breakfast fed (2 trays in) - CO4 Zuniga/CO5 Pearson

*Our mission is to provide public safety, promote positive change in offender
behavior, reintegrate offenders into society, and assist victims of crime.*

P.O. Box 99
Huntsville, Texas 77342-0099
936-437-2170
www.tdcj.texas.gov

Appendix - 030

**0524** Tray(s? – cannot be verified if one or two) picked up - CO4 Zuniga

**0541** 0530 Count/Security check - CO4 Zuniga

**0559** 0530 Count – CO4 Ware

**0624** Security Check - CO4 Zuniga

**0711-0722** Integrity checks performed (did not include 222)

**0825** 0830 Count - CO3 Leobardo Varela

**0827** Med Pass - CO4 Kara Painter/LVN Phillips - Stops and talks to cell

**0834** Speaks to cell - CO3 Varela

**0838** 0830 Count - CO4 Painter

**0855** I/M appears to be cleaning under cell door

**0928** SSI (Henderson, #1650328) mops in front of 222

During time between security rounds, activity on the pod engaged staff (recreation, feeding, etc.)

**1054** Lunch (2 trays in, 1 juiced) - CO4 Painter/CO3 Varela/Henderson

**1108** Trays picked up - CO3 Varela

**1155** CO4 Painter opens, closes slot (reason unknown)

**1235** 1230 Roster Count - CO4 Painter

**1243** 1230 Count - CO3 Varela

**1300** Officers rotate across hallway (CO3 Daniel Smith and CO3 Cheteigra Peterson relieve)

**1317** Security Check - CO3 Smith

**1339** Med Pass - CO3 Peterson/LVN Selese Gibson - slot open, meds into cell

**1505** SSI (Cerda, #1927132) sweeps run

**1517** Security check - CO3 Smith

**1532** Cleaning the cell again

**1625** Dinner meal fed (2 trays in) - CO3 Smith/SSI (Pena, #1362531)

**1653** Tray(s) picked up; CO3 Smith hesitates at slot and then closes it

**1702** Hypercaloric snack into cell - CO3 Smith

Due to delays on the unit, the 1730 count was to be performed after shift change.

**1806** Security Check - CO3 Smith

**1826** Security Check - CO3 Dakota Schmidt; peers into door, calls for Sgt. Barry on radio

**1827** 2nd CO arrives (CO3 Omotolu Okungade)

**1828** Sgt. Barry arrives on scene, initiates ICS and orders offender De La Garza placed in restraints and removed from cell.

**1829** I/M De La Garza placed in restraints and removed from cell, Sgt. Barry enters cell with CO3 Smith

*Our mission is to provide public safety, promote positive change in offender behavior, reintegrate offenders into society, and assist victims of crime.*

P.O. Box 99
Huntsville, Texas 77342-0099
936-437-2170
www.tdcj.texas.gov



# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## Correctional Institutions Division

## Inter-Office Communications

| | | | |
|---|---|---|---|
| **To:** | Regional Incident Review | **Date:** | 03/07/19 |
| **From:** | Elbert Holmes, Asst. Warden<br>James V Allred Unit | **Subject:** | Offender Death (Homicide)<br>I-03957-03-19 |
| | | | Daniel Smith<br>Correctional Officer III<br>Video Review D-pod 1300-1815 hrs. |

Officer Smith conducted a total of four security checks during his shift. Three of the four security checks were conducted on both rows, with his last security check conducted on two row. During his shift there is a total of 34 minutes he was being inattentive to his duties on the pod.

- 1248 hrs. Arrived on pod
- **1316-1327 hrs.** conducted a security check on both rows
- 1337-1346 hrs. escorted maintenance for pluming work
- 1347-1350 hrs. @ cells 123 and 124 talking
- 1353-1354 hrs. @ cell 115
- **1419-1425 hrs.** started security check both rows
- 1426-1437 hrs. goes to rec yard to speak to officers assigned to E-pod. 11 min
- 1438-1442 hrs. asst. with on pod moves
- 1442-1505 hrs. spoke with Officer Peterson as she sat on the barber stool 23 min
- **1516-1521 hrs.** @ cell 123 starts security check both rows
- 1522-1526 hrs. Chow carts arrive, prepared tray carriers for feeding two row
- 1540-1602 hrs. offender in cell 230 takes control of service slot, stops feeding.
- 1602-1612 hrs. Officer Smith remains at the cell until supervisor and video camera arrives. UOF in progress
- 1612-1616 hrs. Officer Smith escorts the cellmate of the UOF offender participant to holding cell.
- 1622-1631 hrs. complete feeding of two row
- 1635-1649 hrs. assisted Officer Peterson with one row feeding
- 1650-1655 hrs. tray pick up on two row by Officer Smith only
- 1705-1710 hrs. assisted Officer Peterson in picking up trays.
- 1714-1719 hrs. both officers at table doing paperwork.
- 1719-1723 hrs. takes a tray to cell 233, stops @ cells 229,205, & 117. Get tray from cell 115 returns to table.
- 1730-1732 hrs. @ cell 116 returns to table paperwork
- **1758-1807 hrs.** @ cells 2221,223,225, & 229. Starts security check on two row.
- 1813 hrs. relieved by 2nd shift.



# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## Correctional Institutions Division

## Inter-Office Communications

**To:**     Regional Incident Review

**Date:**     03/07/19

**From:**     Major Nicholas Flood, JA-EC
James V Allred Unit

**Subject:**     Offender Death (Homicide)
I-03957-03-19

Kara Painter
Correctional Officer V
Video Review D-pod 0623-1256 hrs.

Officer Painter performed no specifically-targeted security checks, although her various duties around the pod called her to move about the pod, upstairs and downstairs, throughout the morning. There are several periods of inactivity greater than twenty minutes, which total 110 minutes. There are several instances of Officer Painter leaving the pod without relief, including one trip to the Commissary. During those periods, only one Rover was available on the G5 wing.

- 0623    CO5 Painter arrives on HSD-Pod
- 0627 – 0632    CO5 Painter inspects the Recreation Yards
- 0633 – 0647    @ Table **11 min**
- 0647 – 0652    CO5 Painter exits the pod (Restroom)
- 0654 – 0706    CO5 Painter conducts **Integrity Checks** of HSD2-01 through HSD2-11
- 0707 – 0722    CO5 Painter conducts **Integrity Checks** of HSD2-02 through HSD2-12
- 0723 – 0732    @ Table **9 min**
- 0732 – 0734    Pours out cooler, makes telephone call
- 0735 – 0742    CO5 Painter exits the pod, goes to Commissary
- 0743 – 0750    Assists in NSC
- 0751 – 0800    Sgt. Miller arrives with COs, CO5 Painter assists in putting out **Recreation**
- 0800 – 0804    @ Table **4 min**
- 0804 – 0812    More NSC
- 0813 – 0832    CO5 Painter escorts Nurse for Med Pass (0827 @ 222, lengthy time, but no meds); CO5 Painter **counts** as she escorts the Nurse on 2-row
- 0832 – 0840    CO5 Painter conducts **0830 Count**
- 0840 – 0904    Assists with more NSC
- 0904 – 0955    @ Table **51 min** (answers phone once, collects food carriers when delivered to pod)
- 0955 – 1012    CO5 Painter helps bring in the Recreation
- 1013 – 1104    CO5 Painter helps feed **Lunch** (1054 HSD2-22 fed two trays)

**Appendix - 033**

- 1028 – 1031   LT Reyes and SGT Jas. Miller on pod, go to HSD2-28, then leave
- 1104 – 1111   CO5 Painter picks up trays on 1-row
- 1114 – 1144   @ Table **30 min**
- 1144 – 1151   CO5 Painter exits the pod (Restroom)
- 1152 - 1155   CO5 Painter feeds sack meals to 126, 106 or 108, 211, and 222 (1155 hrs.)
- 1157 – 1226   @ Table **29 min**
- 1226   Steps out to Rec Yard (gets paperwork)
- 1226 – 1230   Watches Plumbing crew on 2-row
- 1233 – 1241   CO5 Painter conducts the **1230 Count (Roster?)**
- 1245 – 1256   @ Table **11 min**
- 1256   CO5 Painter Exits HSD-Pod (CO3 Peterson does not appear until 1300)



# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## Correctional Institutions Division

### Inter-Office Communications

| | | | |
|---|---|---|---|
| **To:** | **Regional Incident Review** | **Date:** | **03/07/19** |
| **From:** | Major Nicholas Flood, JA-EC James V Allred Unit | **Subject:** | **Offender Death (Homicide) I-03957-03-19** |

**Julio Varelainosencio
Correctional Officer III
Video Review D-pod 0620-1251 hrs.**

Officer Varela only performed a specifically-targeted security check once during his time on HSD-Pod, although his duties had him move about the runs, upstairs and downstairs, frequently. There are three periods of inactivity where CO3 Varela sat at the table, totaling 110 minutes.

- 0620    CO3 Varela arrives @ HSD-Pod; CO3 Patterson (Grievance) on pod
- 0623    CO3 Patterson exits pod
- 0623 – 0628    CO3 Varela makes **Security Check** (flashlight used as necessary)
- 0629 – 0653    CO3 Varela @ table, prepping paperwork
- 0654 – 0706    CO3 Varela performs **Integrity Checks** of cells HSD2-01 through HSD2-11
- 0707 – 0722    CO3 Varela performs **Integrity Checks** of cells HSD2-02 through HSD2-12
- 0723 – 0730    @ Table, doing paperwork
- 0731 – 0733    Accompanies CO3 Simon to HSD2-29
- 0734 – 0735    Goes to HSD2-28
- 0735 – 0737    Back to 229, Offender comes out, gets placed in restraints, and escorted out by CO4 Simon
- 0739 – 0752    CO3 Varela conducts escorts for RN Smith during NSC
- 0753 – 0800    Assists in putting out a shot of **Recreation**
- 0804 – 0823    NSC resumes
- 0823 – 0831    CO3 Varela performs the **0830 count** HSD2-22 @ 0825)
- 0836 – 0903    More NSC (finished)
- 0903 – 0954    @ Table **51 min**
- 0954 – 1011    CO3 Varela assists in bringing in **Recreation**
- 1013 – 1103    **Lunch** fed (1054 HSD2-22 fed two trays)
- 1103 – 1111    CO3 Varela picks up trays on 2-row (1108 HSD2-22 – can't tell if one or two trays)
- 1112 – 1115    Out to Rec Yard (Restroom break and brief walk)
- 1115 – 1145    @ Table **30 min**

**Appendix - 035**

- 1145 – 1149    Assists CO returning 101 and getting 118 out
- 1149 – 1155    @ Table **6 min**
- 1155 – 1158    Escorts Chaplain Volunteer
- 1158 – 1227    @ Table **29 min**
- 1228 – 1235    Escorts Mr. Reeves' Plumbing crew to clear drains (228/234/232)
- 1236 – 1245    CO3 Varela performs the **1230 Count** (HSD2-22 @1243)
- 1246 – 1251    Relieved by CO3 Smith; Exits HSD-Pod



# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## Correctional Institutions Division

## Inter-Office Communications

| To: | **Regional Incident Review** | Date: | **03/07/19** |
|---|---|---|---|
| From: | **Elbert Holmes, Asst. Warden**<br>**James V Allred Unit** | Subject: | **Offender Death (Homicide)**<br>**I-03957-03-19** |
| | | | **Cheteigra Peterson**<br>**Correctional Officer III**<br>**Video Review D-pod 1300-1815 hrs** |

Officer Peterson was inattentive to her duties while assigned to D-pod. Officer Peterson sat on the barber stool located at the end of the pod for a total time of 172 mins. Officer Peterson left the pod for a total of 27 mins. No security checks were done by Officer Peterson until 1800 hours, but only on 1 row. During her security check, Officer Peterson did not take time to look inside the cell. For a total of 184 mins, Officer Peterson did not conduct responsibilities outlined in the cellblock post orders.

- 1300 hrs. Arrived on pod
- 1307-1314 hrs. sat on stool 7min
- 1315-1329 hrs. sat on stool  14 min
- 1329-1335 leaves the pod 6 mins
- 1336-1338 hrs. sat on stool 2 min
- 1342-1347 hrs. sat on stool 5 min
- 1348-1350 hrs. goes to two row stops @ cells 212 & 213
- 1350-1420 hrs. sat on stool 30 min
- 1425-1437 hrs.  Both officers on rec yard talking to the officer on E-pod. 12 min
- 1438-1442 On pod offender moves
- 1441-1448 hrs. sat on stool 7 min
- 1450-1520 hrs. sat on stool 30 min
- 1526-1540 hrs. feeding 2 row, stop due to offender controlling the service slot.
- 1555-1558 hrs. sat on stool 3 min
- 1558-1607 hrs. sat on stool 9 min
- 1612-1622 hrs. sat on stool 10 min
- 1622-1631 hrs. left pod 9 min
- 1635-1704 hrs. feeding one row, completed feeding on one row.
- 1705-1711 hrs. picking up one row trays
- 1717-1757 hrs. sat on stool 40 min
- **1800-1803 hrs. Conducted her first security check while on this pod on one row.**
- 1813 hrs. relieved by 2nd shift.

**Appendix - 037**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **MARY OGUNTODU** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **C.A. No. 7:21-CV-00011** |
| | § | |
| **KARA PAINTER**, et al. | § | |
| *Defendants.* | § | |

**EXHIBIT TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# Exhibit B

Deposition Excerpts of Kara Painter, **Appendix 038 – 076.**

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                WICHITA FALLS DIVISION
3   MARY OGUNTODU                )
                                 )
4   vs.                          ) CIVIL ACTION NO. 7:21-cv-11
                                 )
5                                )
    KARA PAINTER, ET AL.         )
6
7                       **ORIGINAL**
8

_____

9
10             REMOTE ORAL DEPOSITION OF
11                   KARA PAINTER
12               SEPTEMBER 13, 2022
13  _____
14
15
16       REMOTE ORAL DEPOSITION OF KARA PAINTER, produced as
17  a witness at the instance of the Plaintiff and duly
18  sworn, was taken in the above-styled and -numbered cause
19  on the 13th day of September 2022, from 10:33 a.m. to
20  12:30 p.m., before Delicia Struss, Certified Shorthand
21  Reporter and Certified Real Time Reporter in and for the
22  State of Texas, reported remotely by computerized
23  stenotype machine via Zoom videoconference, pursuant to
24  the Federal Rules of Civil Procedure and the provisions
25  stated on the record or attached hereto.

9



1

2

3

4

5

6

7

8

9

10

11

12

13    Q.    Can you state your full name for us, please.

14    A.    Kara Painter.

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16    Q.    Okay.    When an officer comes in to relieve you

17  off pod, is it customary for you to let them know kind

18  of what's going on in the pod when they come in?

19    A.    Yes.

20    Q.    And did you have a conversation like that with

21  Ms. Peterson on March 7, 2019?

22    A.    No.    I gave the passdown to Smith.

23    Q.    So you passed down to Smith, meaning that you

24  gave Smith -- and we're talking about Officer Smith --

25  information about what was going on in the pod?

1    A.    Yes.





1

2

3

4

5

6

7

8

9

10

11

12

13    Q.    Was there any other information exchanged

14 between you and Ms. Peterson during this time period

15 between when you left delta pod and Ms. Peterson went to

16 delta pod?

17    A.    No.

18

19

20

21

22

23

24

25

KARA PAINTER                                         SEPTEMBER 13, 2022

21

1

2    Q.    On March 7, 2019, you were working for the

3    Department of Criminal Justice, correct?

4    A.    Correct.

5    Q.    Texas Department of Criminal Justice, that is.

6    A.    Correct.

7    Q.    And you were working that day at the James V.

8    Allred Unit?

9    A.    Correct.

10   Q.    And where is that unit located, ma'am?

11   A.    Wichita Falls, Texas.

12   Q.    Your assigned shift that day was in delta pod,

13   correct?

14   A.    Correct.  First half of the day on delta pod.

15   Q.    And delta pod is where inmate Joseph Oguntodu

16   was housed, correct?

17   A.    Correct.

18   Q.    Do you remember which cell he was housed in?

19   A.    I believe it was 2-22.

20

21

22

23

24

25

1

2

3

4

5

6      Q.    And so that's what you consider to be a

7   security check, is when you're walking by and you check

8   the cells?

9      A.    Yes.

10      Q.    And when you say, "check the cells," what do

11   you mean?

12      A.    You look in, make sure the inmates are in

13   there.

14      Q.    You look into the -- through the window?

15      A.    Yes.

16      Q.    And when you say you "make sure the inmates are

17   in there," what do you -- how do you make sure they're

18   in there?

19      A.    That you physically see bodies.

20      Q.    Do you need to see if they're okay or just to

21   see if their body is in there?

22      A.    Well, when you look -- when you look and check

23   on them, you just observe the scene.  If it's just a

24   normal, everyday thing, you just are looking in the cell

25   to see people.

```
 1      Q.    And, again, when you're looking in the cell,
 2   are you opening the door to look in?  Or you're looking
 3   through the window?
 4      A.    Looking through the window.
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

KARA PAINTER                                    SEPTEMBER 13, 2022

31

1    Q.    And, again, when you're looking in the cell,

2  are you opening the door to look in?  Or you're looking

3  through the window?

4    A.    Looking through the window.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19      Q.    And so what specifically did you take issue

20  with in this disciplinary investigation?

21      A.    They kept saying I didn't do security rounds,

22  yet that whole morning, we were busy on the pod,

23  completely walking the pod, checking the cells, doing

24  our work -- medical, dental, the whole 9 yards -- ran

25  rec, passed out trays for lunch.

1

2

3

4     Q.    Do you disagree with that statement?

5     A.    With that statement?  No.  There was not a

6 dedicated security check, but there were security checks

7 while doing other stuff.

8     Q.    And those security checks while doing other

9 stuff -- I believe you were saying when you were walking

10 around, taking care of food, taking care of different

11 things, you were looking in the cells.  Correct?

12    A.    Correct.

13    Q.    And, again, you said you were looking in the

14 cells by looking in the window, correct?

15    A.    Correct.

16

17

18

19

20

21

22

23

24

25

40

1      Q.   And then it says, in No. 2, "During each
2  security check, the cellblock officer shall check all
3  offenders for:  Injury; illness; and prohibited
4  behavior."  Correct?
5      A.   Correct.
6      Q.   And, again, this is the post order that you
7  were found to have violated, which led to your
8  termination, correct?
9      A.   Correct.
10     Q.   Do you disagree with the finding that you
11 violated this post order?
12     A.   Yes.
13     Q.   And why is it you disagree with that?
14     A.   Because every time I walked by a cell, I did
15 all that right there.
16     Q.   Every time you walked by a cell, you would
17 check for cleanliness?
18     A.   Yes.
19     Q.   Every time you walked by a cell, you would
20 check to see if the inmates inside the cells were
21 injured?
22     A.   Yes.
23     Q.   Or if there was any prohibited behavior?
24     A.   Yes.
25     Q.   And every time you walked by a cell, you would

1  check to make sure that the windows and light fixtures
2  had not been tampered with?

3      A.    Yes.

4      Q.    And the way that you would check to make sure
5  that the inmates were not injured and there was no
6  prohibited behavior going on inside the cell was to look
7  through the windows, correct?

8      A.    Correct.

1

2     Q.   When you got to work on March 7, 2019, did you

3  know who inmate Joseph Oguntodu was?

4     A.   Not that I know of.

5     Q.   Had you ever had any sort of interaction with

6  him that stood out in your mind?

7     A.   I -- no recollection.

8     Q.   Had you ever had any sort of incident involving

9  Mr. Oguntodu prior to March 7, 2019?

10    A.   Not that I recollect.

11    Q.   What about with his cellie, Mr. de la Garza?

12  Had you ever had any incident with him prior to March 7,

13  2019?

14    A.   Not that I recollect.

15    Q.   Did you know who Mr. de la Garza was when you

16  got to work on March 7, 2019?

17    A.   No, not that I recollect.

18    Q.   Was it customary for you to work in D pod?

19    A.   No.  I worked every pod in the building.

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9  Q.  Okay.  These inmates are allowed to be housed

10 with other inmates, though, clearly, correct?

11  A.  Correct.

12  Q.  So they're not on some sort of solitary

13 confinement level; is that right?

14  A.  Right.

15  Q.  Is this the highest-level general population?

16  A.  Yes.

17  Q.  Based off of their disciplinary conduct?

18  A.  Yes.

19  Q.  Would you describe the inmates that are on G5

20 in the D pod to be more dangerous than lower-level

21 inmates in the facility?

22  A.  In the facility?  No.

23  Q.  What is it about the way that question was

24 phrased with "in the facility" that gave you hesitation?

25  A.  Well, if you think about the whole -- whole

```
 1  facility, it's -- any inmate at any time can -- can
 2  cause harm to anybody.
 3      Q.   Fair.  Would you say that these G5 inmates in
 4  the D pod are more dangerous, based off their
 5  disciplinary level, than an inmate that is maybe a lower
 6  level, such as G1, 2, 3, or 4?
 7               MR. GARCIA:  Objection.  Speculation.
 8               You can answer.
 9      A.   I'm sorry.  I just lost my train of thought.
10      Q.   (BY MR. ROBERTS)  Yeah.  Fair enough.  And it
11  probably wasn't a great question, so let me rephrase
12  that.
13               I'm just trying to figure out what type of
14  inmates are in the D pod.  Based off of what you
15  described as they've had disciplinary history, I'm
16  trying to figure out if you would agree with the
17  statement that the inmates in D pod are considered to be
18  threatening or violent, or anything like that.
19      A.   Well, yeah, they would be considered, because
20  any inmate could do that at any time.
21      Q.   So is it your testimony that an inmate that's
22  on Level G1 is considered to be the same threat or
23  danger level as an inmate that's on Level G5?
24      A.   They have the potential to.
25
```

1

2

3

4

5

6

7

8

9

10

11

12

13    Q.    All right.  On March 7, 2019, when you were

14 working in D pod, you made contact with Cell 222 in the

15 morning; is that correct?

16    A.    Correct.

17    Q.    Do you remember that interaction, or you just

18 know that based off of your report?

19    A.    Based off my report.

20    Q.    Do you have any other recollection of that

21 interaction other than what you wrote in your report?

22    A.    No.

23    Q.    To be clear, what you said about this

24 interaction is "The pill nurse showed up, and I escorted

25 her while she passed medication.  Cell 222 had the cell

1  door window covered.  I knocked on the door and ordered
2  the offender to uncover their window.  An offender
3  stated that he was on the toilet, to just put the
4  medication in the slot.  I replied the slot wasn't going
5  to open until the window was uncovered.  The offender
6  VR'd his medication, and we moved on."

7

8

9

10

11

12

13

14

15

16     Q.   All right.  It was during this interaction that
17  you realized the window on the cell was covered,
18  correct?
19     A.   Correct.
20     Q.   You wrote that in your report, correct?
21     A.   Yes.
22     Q.   You ordered the offender inside the cell to
23  remove that window covering, correct?
24     A.   Yes.
25     Q.   However, nobody inside the cell did remove

KARA PAINTER                                    SEPTEMBER 13, 2022

52

1  that window covering, did they?

2      A.    No, not at that time.

3      Q.    And I'm talking -- we're talking right now

4  about that -- that first contact that we just discussed

5  in your report.  Okay?

6      A.    Yeah.

7      Q.    During that first interaction, nobody removed

8  the window covering from the cell, correct?

9      A.    Correct.

10     Q.    And that was in violation of the facility's

11 rules, correct?

12     A.    Correct.

13     Q.    And according to the post order that we just

14 read, one of the things you're supposed to check for is

15 whether or not windows have been tampered with, correct?

16     A.    Correct.

17     Q.    And if a window is covered, then it has been

18 tampered with, correct?

19     A.    Correct.

20     Q.    You ended up walking away from the cell without

21 anyone ever removing that cover at this interaction,

22 correct?

23     A.    Correct.

24     Q.    So you were, in fact, in violation of that post

25 order.  Would you agree?

KARA PAINTER                                SEPTEMBER 13, 2022

53

1       A.    A lot of times, you've got to give them the
2 time they have on the toilet and then come back, because
3 when I came back, the window covering was down.
4       Q.    Okay.  During that first contact with Cell 222,
5 when the window was covered, you spoke to both
6 Mr. Oguntodu and Mr. de la Garza, correct?
7       A.    Correct.
8       Q.    And, in fact, both Mr. Oguntodu and
9 Mr. de la Garza spoke back to you, correct?
10      A.    Correct.
11      Q.    And what was it that you remember Mr. Oguntodu
12 saying to you?
13      A.    I don't recollect a whole lot about that day
14 anymore.
15      Q.    Do you not remember what Mr. Oguntodu said to
16 you during this first interaction?
17      A.    I do not recall.
18      Q.    Do you remember what Mr. de la Garza said to
19 you during this first interaction?
20      A.    I don't recall.
21      Q.    During this interaction, Mr. Oguntodu told you
22 that he was having problems with his cellmate, didn't
23 he?
24      A.    Not that I recall.
25      Q.    During this interaction, Mr. Oguntodu also told

KARA PAINTER                                    SEPTEMBER 13, 2022

54

1    you that he was in danger in his cell; is that correct?

2        A.    No, not that I recall.

3        Q.    During this interaction, Mr. Oguntodu told you

4    that he needed to get out of his cell because he wasn't

5    going to survive; is that correct?

6        A.    Not that I can recall.

7        Q.    And during this interaction, Mr. Oguntodu made

8    it clear to you that his life was in danger if he was

9    not moved cells; is that correct?

10       A.    No, not that I recall.

11       Q.    Did you respond to Mr. Oguntodu to "be a man"?

12       A.    No.  I don't recall doing that at all.

13       Q.    Did you respond to Mr. Oguntodu that he needed

14   to "take care of it"?

15       A.    I do not recall.

16       Q.    Christopher de la Garza was the other inmate in

17   that cell.  Is that something that you're aware of?

18       A.    That's what all the reports say.

19       Q.    During this first interaction that we've been

20   discussing at Cell 222, Mr. de la Garza told you that

21   you needed to go away because he was going to kill his

22   cellie; is that correct?

23       A.    Not that I recall, no.

24       Q.    You then responded to Mr. de la Garza to make

25   sure he had had it done when you got back; is that

1  correct?

2      A.    No.

3      Q.    So you said "not that I recall" to many

4  questions, but you said "no" to that one.  Do you

5  actually remember not saying that?

6      A.    I don't ever recall saying that.  No.

7      Q.    Is it that you know you didn't say it or you

8  just don't know if you said it?

9      A.    It doesn't sound like something I would say,

10 so -- and I don't recall saying it.

11     Q.    Can you testify to the jury today that you did

12 not say that?

13     A.    No.  I just don't recall.

14     Q.    This interaction that you had that we've been

15 discussing was at 8:27 a.m.  Does that sound fair to

16 you?

17     A.    Sure.

18

19

20

21

22

23

24

25

1

2

3

4

5      Q.    This is a 24-hour time line of what the video

6   shows of HSD2-22 cell.  Okay?  It starts off with

7   March 6, 2019, and then goes to March 7, 2019, showing

8   the activity that occurred outside of the cell.

9              At 8:27 there was a medical pass with you

10  and LVN Phillips where you stopped and talked to the

11  cell, correct?

12      A.    Yes.

13      Q.    And that 8:27 a.m. medical pass -- that's the

14  interaction that we've been discussing, correct?

15      A.    Yes.

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18      Q.    Did you actually see an offender on the toilet?

19      A.    Not until the thing came down when I came back

20 by with the count sheet.

21      Q.    Okay.  During that first interaction at 8:27,

22 did you actually see an offender on the toilet?

23      A.    No.

24

25

62

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    Q.    Let's get to that.    All right?    Your second

23  contact with Cell 222 on March 7, 2019, was when you

24  conducted the 8:30 count, correct?

25    A.    Correct.

1    Q.   Here's what you said about that interaction.
2  I'll zoom in for you.   This is back on your report,
3  which has been marked as Exhibit A.   You said, "At 0830
4  count, I knocked on every door and made every offender
5  move.   I started count on 2 row, and Cell 222 had his
6  window covered.   I knocked on the door, and an offender
7  said, 'Two times.'   I noted on my count sheet and
8  finished my count."   Is that what you wrote in your
9  report?

10    A.   That's what it says.

11    Q.   And you have no other recollection of your 8:30
12  count other than what you wrote in this report, correct?

13    A.   Correct.   Because if you keep on going down, it
14  says I went back by and the cell door was uncovered and
15  I checked and seen him.

16            MR. ROBERTS:   So I'm going to move to
17  strike everything after "correct."

18    Q.   (BY MR. ROBERTS)   I'm simply asking you right
19  now about the second interaction you had with Cell 222
20  during your 8:30 count.   Okay, ma'am?

21    A.   Sure.

22    Q.   You have no other recollection about this 8:30
23  count with Cell 222 other than what you have in this
24  report, correct?

25    A.   Correct.

64

1    Q.    And this 8:30 count was actually conducted
2  at -- I'm going to refer you to what's been marked as
3  Exhibit H, the 24-hour time line of Cell 222.
4              And see here that at 8:38 a.m. is when you
5  conducted the 8:30 count.  Correct?
6    A.    That's what it says.  But count was called
7  late.
8    Q.    What do you mean, "count was called late"?
9    A.    You can't start counting the pod until they
10  actually call count, until GP calls count.  They didn't
11  call it at 8:30 that day, because I was grabbing a count
12  sheet to walk with the -- the nurse to pass meds so I
13  would have it so whenever they did call count.
14    Q.    Okay.  And so according to this 24-hour
15  time sheet and what you're saying is that count was
16  called late.  You did count at 8:38 a.m., correct?
17    A.    I counted after I finished passing meds.
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10    Q.    You then put in your report that following --
11  well, let me ask you this:  When you did your 8:30 cell
12  count on Cell 222, you stated that an offender stated,
13  "Two times," correct?
14    A.    Correct.
15    Q.    You didn't verbally hear something from both
16  offenders, correct?
17    A.    Not at that time.
18    Q.    And that's the time I'm asking you about.
19          So at that time, when you did your 8:30
20  cell count, you did not actually hear both offenders
21  respond to you, correct?
22    A.    Correct.
23    Q.    And at that time, the window was still covered,
24  correct?
25    A.    Correct.

1     Q.    And so not only did you not hear each offender
2  respond, but you didn't see either of the offenders
3  either at that 8:30 cell count, correct?
4     A.    Correct.
5     Q.    As we sit here today, do you know which inmate
6  it was that said, "Two times"?
7     A.    It was a Hispanic voice.
8     Q.    The Hispanic inmate said, "Two times"?
9     A.    Yes.
10
11
12
13
14
15
16
17
18
19
20    Q.    You state -- and this is just following the
21  "two times" interaction, where you did your 8:30 cell
22  count.  You state, "I then asked Officer Varela how many
23  he had in Cell 222.  I then went to the back of the pod,
24  went upstairs, and walked by 222 cell again.  The window
25  was uncovered.  The black offender was standing at the

1  toilet, and the Hispanic offender was climbing into the

2  top bunk.  We then brought rec in off the rec yard."

3          Is that what you put in the report?

4     A.   Yes.

25    Q.   So is your testimony to the jury that following

1  the 8:30 cell count, you didn't know if there were two
2  offenders in the cell?

3      A.    When I finished my cell count for the pod, I
4  did -- I knew there was two in there, because I went
5  back and checked.  It says so right there.  I walked
6  back and walked the pod and walked back by.

7      Q.    Okay.  And it's your testimony to the jury that
8  when you walked back by, the window was uncovered on
9  Cell 222, correct?

10     A.    Correct.

11     Q.    It's also your testimony to the jury that when
12 you walked back by, you saw a black offender,
13 Mr. Oguntodu, and Hispanic offender, Mr. de la Garza,
14 both in the cell, correct?

15     A.    Correct.

16     Q.    And that the black offender, Mr. Oguntodu, was
17 standing at the toilet, correct?

18     A.    Correct.

19     Q.    I guess -- actually, let me -- you then state
20 that "We then brought rec in off the rec yards."
21 Correct?

22     A.    Correct.

23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    Q.    And so the next interaction that you had was --

22  with Cell 222 was feeding lunch, correct?

23    A.    Correct.

24    Q.    And that's when you wrote in your report:   "The

25  chow carts got there, and we fed the pod.   When I feed

1  G5 pods, both offender must move to get their trays.

2  Two trays went into 222."  Correct?

3      A.   Correct.

4      Q.   Okay.  You don't write whether or not the

5  window was uncovered there, do you?

6      A.   I do not.

7      Q.   As you stated, you don't have a recollection of

8  this day, so let me just ask you:  Do you -- as we sit

9  here, do you remember whether or not the window was

10 uncovered when you fed the lunch to the inmates?

11     A.   Well, if they got fed two trays, then the

12 window was uncovered, because I don't pop a slot with

13 the window covered.

14     Q.   Okay.  And so you are basing that off of your --

15 just what normal routine is, that if the window is not

16 uncovered, you're not going to open that slot?

17     A.   Correct.

18     Q.   So your testimony is that if you fed them two

19 trays, then while you don't remember it, according to

20 what you usually do, that means that the window was

21 uncovered, correct?

22     A.   Correct.

23

24

25

KARA PAINTER                                          SEPTEMBER 13, 2022

74

1    Q.   You didn't say in your report whether or not
2  you saw either of the inmates when you delivered lunch;
3  is that correct?
4    A.   I did not write that.  Correct.
5    Q.   As we sit here, do you remember if you saw
6  either of the inmates?
7    A.   I had to have, because each inmate has to come
8  get their tray.
9    Q.   Okay.  Again, that's based off of the way you
10 usually do things, correct?
11   A.   The way I feed a -- feed a pod.  Correct.
12   Q.   But you don't have a memory of seeing both
13 inmates get their trays, correct?
14   A.   Well, if two trays went in, both of them moved.
15   Q.   Right.  And, ma'am, I guess my question is, Do
16 you, as we sit here, have a specific memory of seeing
17 both inmates inside the pod -- inside the Cell 222 when
18 you handed the trays?
19   A.   I do not recall.  If -- if you're talking about
20 if I remember physically, I do not.
21   Q.   Okay.  So when you say that two offenders moved
22 in Cell 222, you're basing that strictly off of the way
23 you usually do things, correct?
24   A.   Correct.
25   Q.   And the time which you fed the lunch to

75

1  Cell 222 was at 10:54 a.m.?  Do you agree with -- at
2  least that's what the time line that's been marked as
3  Exhibit H states?
4      A.    Yes.
5      Q.    You do not -- let me ask this:  When you fed
6  the lunch trays to Cell 222, did you check on
7  Mr. Oguntodu's well-being?
8      A.    Yes.
9      Q.    You did?  In what way did you do that?
10     A.    It's physically checking and looking at them as
11 they move around the cell to come get the tray.
12     Q.    But you actually don't have a memory of doing
13 that, correct?
14     A.    Correct.  I don't physically recall doing that,
15 but that's how I feed, because that's one of the best
16 opportunities to check on everybody.
17     Q.    That's generally how things work, but you don't
18 remember that happening on this day?
19     A.    I do not recall three years later.  No.
20     Q.    Okay.  And that is not stated in your report,
21 that you saw the inmates, correct?
22     A.    Correct.
23     Q.    The next time you went to Cell 222 was during
24 the 12:30 check.  Would you agree with that?
25     A.    Me personally?  Yeah, I agree with that.

1      Q.    Yes, ma'am, you personally.

2            Let me know when you can see the screen,

3  please.   Can you see that, ma'am?

4      A.    Yes.

5      Q.    Okay.   And so in your report, which has been

6  labeled Exhibit A, you then state, "We then did the 1230

7  count.   Officer Varela did the roster count, and I did

8  the head count.   Everyone either moved or sounded off

9  for the count."   Correct?

10     A.    Correct.

11     Q.    Okay.   And that is the extent of your memory,

12  as we sit here today, of what happened during the 12:30

13  count, correct?

14     A.    Correct.

15     Q.    Do you remember if the window was covered or

16  uncovered during that 12:30 count?

17     A.    I don't recall any issues.

18

19

20

21

22

23

24

25

1

2

3

4

5

6    Q.    Is it your testimony that at any time during

7 your shift, you physically saw Mr. Oguntodu?

8    A.    One more time.

9    Q.    Is it your testimony that at any time during

10 your shift on March 7, 2019, you physically saw

11 Mr. Oguntodu?

12    A.    Yes.  I physically saw him several times.

13    Q.    Several times?

14    A.    It's not written down anywhere but, yes, I've

15 seen him.

16    Q.    When was it that you saw him that's not written

17 down?

18    A.    Well, after the 8:30 count, when I walked back

19 by the cell; for lunch; and then Varela's the one that

20 did -- did 2 row most of the day, all the checking on

21 2 row.

22    Q.    Are you saying that you saw Mr. Oguntodu when

23 Mr. Varela was doing the count on 2 row?

24    A.    No.  I'm saying I physically saw the black

25 offender at the 8:30 count and then while feeding chow.

KARA PAINTER                                    SEPTEMBER 13, 2022

82

1  Varela --

2      Q.    At the 8:30 chow -- at the 8:30 count or in

3  that instance that you discussed where you went back up

4  after the 8:30 count?

5      A.    Correct.

6      Q.    Which one?

7      A.    The second one.  When I -- when I finished

8  looking in all the cells the first time, all the ones I

9  questioned, I went right back and rechecks.  Yes, so

10 after that.

11     Q.    Okay.  Let me know when you can see it on your

12 screen again, ma'am.  Can you see that?

13     A.    Yeah.

14     Q.    Okay.  Again, this is the 24-hour count, which

15 is labeled as Exhibit H.  There was a time on the video,

16 at least that was marked down in the 24-hour time line

17 of Cell C222, that shows you, apparently, at 11:55 go up

18 and open and close the slot on the cell.

19     A.    Yes.

20     Q.    That is not in your report.  Do you know what

21 this is talking about?

22     A.    Yeah.  That -- the kitchen didn't have any of

23 the hypocaloric snacks on the lunch cart, so I had to go

24 and -- when they got -- came down, I had to go and

25 deliver the hypocaloric snacks.

1    Q.   And do you remember which inmate in Cell 222
2  received that snack?

3    A.   I don't remember which one got it, but I opened
4  the -- the window was uncovered, and the light was
5  uncovered.

6    Q.   So it's your testimony that you remember the
7  window and light being uncovered at the 11:55 time when
8  you went to get the sack lunch?

9    A.   Yes.

10   Q.   Okay.  Even though that's not in your report,
11  you actually do remember that?

12   A.   Well, it says I opened and closed the slot.  So
13  in order for me to open and close the slot, the window
14  has to be uncovered and the light has to be uncovered.

15

16

17

18

19

20

21

22

23

24

25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **MARY OGUNTODU** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **C.A. No. 7:21-CV-00011** |
| | § | |
| **KARA PAINTER**, et al. | § | |
| *Defendants.* | § | |

### EXHIBIT TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# Exhibit C

Surveillance Video, **Appendix 077.**

**Appendix - 077**